LEWIS KOHN & WALKER, LLP
KENT M. WALKER (173700)
kwalker@lewiskohn.com
15030 Avenue of Science, Suite 201
San Diego, CA 92128
Phone: (858) 436-1333
Fax:   (858) 436-1349

Attorney for Defendants,
AVIATOR NATION, INC. and PAIGE MYCOSKIE

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ILC TRADEMARK CORPORATION, a British Virgin Islands corporation,<br><br>Plaintiff,<br><br>v.<br><br>AVIATOR NATION, INC., a California Corporation, and PAIGE MYCOSKIE, an individual<br><br>Defendants. | Case No.  2:17-cv-07975-MWF(JPRx)<br><br>**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW [LR 16-4]**<br><br>**Pre-Trial Conf: April 8, 2019**<br>**Trial Date:  April 23, 2019** |

1

Table of Contents

I.     Introduction...........................................................................4

II.    Summary statement of the claims Plaintiff has pleaded and plans to pursue; elements.................................................5

    a.   Claim 1: Federal Trademark Infringement, Unfair Competition. ...............................................................5

    b.   Claim 2: California Unfair Competition and Trademark Infringement. ...............................................6

III.   Brief description of Defendants' key evidence in opposition to each of the claims. .......................................6

    a.   Claim 1: Federal Trademark Infringement, Unfair Competition. ...............................................................6

        1.   Strength or Weakness of the Plaintiff's Mark.................7

        2.   Defendants' Use of the Mark. ..................................8

        3.   Similarity of Plaintiff's and Defendants' Marks............9

        4.   Actual Confusion...........................................10

        5.   Defendants' Intent. .........................................11

        6.   Marketing/Advertising Channels. ..............................11

        7.   Consumer's Degree of Care. ...................................12

    b.   Claim 2: California Unfair Competition and Trademark Infringement. ..........................................12

IV.   Summary statement of counterclaims and affirmative defenses Defendants have pleaded and plan to pursue; Elements. ...................12

    a.   Counterclaim 1 and related defenses – Fraud on the USPTO:...............................................12

    b.   Counterclaim 2 and related defenses - Ornamentality, Fair Use: ...............................................13

    c.   Counterclaim 3 and related defenses - Abandonment:............14

    d.   Counterclaim 4 and related defenses - Lack of Control, Not Distinctive As a Source: .......................14

    e.   Affirmative defense nos. 2-6, 9 - Laches, Acquiescence, Waiver, Estoppel, Statute of Limitations, Failure to Mitigate:...............................................15

V.     Brief Summary of Defendants' Key Evidence in Support of Counterclaims and Affirmative Defenses. ...........................................15

    a.     Counterclaim 1 and related defenses: Fraud on the USPTO. ..................................................................................15

    b.     Counterclaim 2 and related defenses: Ornamentality, Fair Use. ..................................................................................16

    c.     Counterclaim 3 and related defenses: Abandonment and Prior Use. ..................................................................................19

    d.     Counterclaim 4 and related defenses: Lack of Control, Not Distinctive As a Source. ................................................22

    e.     Affirmative Defense of Laches ...............................................25

    f.     Affirmative Defense of Failure to State a Claim. ....................27

    g.     Affirmative Defense of Lack of Damages ...............................27

    h.     Affirmative Defense of Unclean Hands and Trademark Misuse. ..................................................................................29

VI.    Identification of any anticipated evidentiary issues, together with Defendants' position on those issues ...........................................30

VII.   Identification of any issues of law, such as the proper interpretation of a governing statute, which are germane to the case, together with Defendants' position on those issues. .................33

VIII.  L.R. 16-4.3 Bifurcation of Issues. ......................................................33

IX.    L.R. 16-4.4 Jury Trial. .......................................................................34

X.     L.R. 16-4.5 Attorneys' Fees. .............................................................34

XI.    L.R. 16-4.6 Abandonment of Issues. .................................................34

Appendix A - SUMMARY OF FACTS REGARDING MISREPRESENTATIONS TO THE USPTO (See, testimony of Lee and Maxham and Trial Exhibits 302-305, 381, 429-430, 436-458, 464, 502, 511, 514, 517-518)

Appendix B - SUMMARY OF FACTS AND LAW AGAINST ANY CLAIM OF COUNTERFEITING

Appendix C – ILLUSTRATIONS OF DEFENDANTS EXEMPLARY USES FROM 2006 TO 2009

Defendants Aviator Nation, Inc. and Paige Mycoskie ("Defendants") provide this Memorandum of Contentions of Fact and Law pursuant to Local Rule 16-4.

## I. **Introduction**

This action arises from Plaintiff's assertions of trademark infringement based on its purported U.S. trademark registration no. 4,384,212 (the "'212" registration) for the mark ⚡ ("Mark") or various goods including clothing, based on Defendants' use of bolt designs in connection with clothing.  However, Plaintiff's action fails legally and factually in many ways.

Plaintiff is a foreign holding company, with no office, no employees and two directors overseas.  It is a non-practicing entity.  It does not make or sell products.  It does not use the alleged mark in interstate commerce or elsewhere.  It does not even license the alleged mark.  Rather, third parties, purportedly authorized by Plaintiff, license the Mark along with other marks.  There has been no such license for the Mark in existence in the U.S. since 2014.

Plaintiff has identified a single license purporting to license use of the asserted Mark in the U.S., which existed from 2008 to 2014.  Plaintiff is not the licensor of that license, rather a third party is (another foreign, non-practicing entity).  Defendants contend that Plaintiff did not control that entity, nor has it otherwise controlled use of the asserted mark in the U.S.  It appears that Plaintiff did not even receive license fee payments made by the single licensee.

Plaintiff claims it has ties to prior use of the asserted Mark, including back to the 1970's, but the '212 registration claims first use in 2009 and use of the alleged mark had been dead for years in the U.S. for many years before this.[1]  Plaintiff cannot demonstrate chain of title and continuous use in commerce back to the 1970's.

Defendants are a local clothing company and its founder that started using bolt

---

[1] Defendants also contend that Plaintiff, including entities and people who maintained they were agents of Plaintiff, made misrepresentations to the USPTO to obtain the '212 registration, including with respect to the first use dates and the goods on which the mark was actually used.

designs and various other designs on Aviator Nation clothing in 2006 - three years before Plaintiff's '212 registration claims first use.  Aviator Nation has continued such use for the past twelve plus years with substantial success.  Meanwhile, numerous other third parties use bolts on clothing in the U.S. as well.  According, Plaintiff abandoned the Mark, the Mark is invalid and Defendants do not infringe.

Further, Plaintiff, including through its purported agents, was aware of Aviator Nation's alleged infringement since 2010, made cease and desist demands to Aviator Nation in 2012, 2013 and 2016 and filed this action in late 2017.  Plaintiff delayed for over seven years before bringing this action.  Meanwhile, Defendants have been substantially prejudiced by Plaintiff's delay.  Laches should bar all of Plaintiff's claims for relief.

## II.   Summary statement of the claims Plaintiff has pleaded and plans to pursue; elements.

### a. Claim 1: Federal Trademark Infringement, Unfair Competition.

The elements required to establish Plaintiff's claim for Federal trademark infringement and unfair competition are as follows:

1.     the "Lightning Bolt Design" is a valid, protectable trademark;

2.     the Plaintiff owns the "Lightning Bolt Design" as a trademark; and,

3.     the Defendants used the plaintiff's "Lightning Bolt Design," or a mark similar to the plaintiff's "Lightning Bolt Design," without the consent of the Plaintiff in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods.

*See* Ninth Circuit Manual of Model Civil Jury Instructions § 15.6 (2017); *see also Cleary v. News Corp.,* 30 F.3d 1255, 1262-1263 (9th Cir. 1994) (elements for trademark infringement under Section 32 of the Lanham Act and unfair competition under Section 43 of the Lanham Act are "substantially congruent").

### b. Claim 2: California Unfair Competition and Trademark Infringement.

*See* Elements for Claim 1, *supra*.

*See Cleary v. News Corp.,* 30 F.3d at 1262-1263 (elements for trademark infringement under Section 32 of the Lanham Act, unfair competition under Section 43 of the Lanham Act, state common law claims for unfair competition, and unfair competition under Cal. Bus. & Prof. Code are all "substantially congruent").

## III. Brief description of Defendants' key evidence in opposition to each of the claims.

### a. Claim 1: Federal Trademark Infringement, Unfair Competition.

Regarding ownership, invalidity, noninfringement, *see* Defendants' Counterclaims 1, 2, 3 and 4 and affirmative defenses in Section V below.  In sum, Defendants challenge whether Plaintiff can establish its ownership of a valid mark for a "Lightning Bolt Design" because: a) Plaintiff's "Lightning Bolt Design" is not inherently distinctive and lacks secondary meaning; b) Defendant Aviator Nation's use of a "lightning bolt" design on its clothing was not a "trademark use," but rather, merely ornamental, and as such, no trademark infringement or unfair competition claims can be stated against Defendants; c) if Defendant Aviator Nation's use of a "lightning bolt" design can be considered a "trademark use" such that liability could be found, Plaintiff's own Complaint alleges that Defendants used the same "lightning bolt" designs three years before Plaintiff's claimed first use in its '212 trademark registration, and therefore, Plaintiff cannot prove ownership of the "Lightning Bolt Design," and Plaintiff cannot stop or claim damages for Defendants' continued use thereof; d) Plaintiff's "Lightning Bolt Design" was abandoned, both before Plaintiff obtained any assignment for any purported related rights to the "Lightning Bolt Design"--which chain of title Plaintiff has failed to establish--and afterward; e) Plaintiff's trademark registration was fraudulently procured; f) Defendant Aviator

Nation's use of a "lightning bolt" design on its clothing is fair; and, g) Plaintiff's claims are barred by the doctrines of laches and acquiescence.

Regarding the absence of any actual damages, which means Plaintiff should have no claim to Defendants' profits or an injunction, see Section V.G. below.

Regarding likelihood of confusion factors:

### 1. Strength or Weakness of the Plaintiff's Mark.

Plaintiff has not been using the Mark in interstate commerce in the U.S. since the end of 2014, when the only U.S. license of the Mark it has identified in this action expired.[2] That license agreement was between an entity called HTIL Corporation, BV ("HTIL") and Têxtil Manuel Gonçalves, S.A. ("TMG").[3] See, e.g., Trial Exhibits 304-309 (the agreement and related documents); Trial Exhibits 476-479 (Plaintiff's discovery responses admitting the foregoing); testimony of Yian Lee, Plaintiff's only party witness[4]. So, there has been nothing for the consuming public to recognize for at least four years, which demonstrates significant nonuse and conceptual weakness and significantly weakens the Mark.

Plaintiff does not use the Mark, but if it did, it would be used as a simple "lightning bolt" design in a merely ornamental or decorative way, not as a source identifying symbol.  See, e.g., Trial Exhibits 75, 80.

[2] To be clear, as noted in the Introduction above, Plaintiff is a non-practicing entity.  It does not make or sell products.  It does not use the alleged mark in interstate commerce or elsewhere.  The only way it could claim use is through a license.  *Id.*

[3] TMG had a subsidiary in the U.S. called TMG USA Import Export, Inc., through which it allegedly sold clothes in the U.S. pursuant to the license.  See, testimony of Lee, Brussell.

[4] Mr. Lee admits the foregoing on behalf of Plaintiff:
Q: Has ILC licensed the right to use the Mark in the U.S. to others?
A ILC licensed the Mark to a company called TMG back in 2008.
Q Is that license still active?
A No, it expired in -- end of 2014.
Q Has ILC licensed the right to use the Mark in the U.S. to any other entity other than TMG?
A No. Well, from 2012 up to now ILC only license to TMG.
Q Do you know whether ILC licensed the right to use the Mark in the United States to any other entity than TMG?
THE WITNESS: No.
(Lee Depo. at p. 20:3-19).

There are many third-party registrations for lightning bolts on clothing, including many with similar shapes to the Mark. See, e.g., Defendants' Exhibits 412-428. So, the field is very narrow, which similarly weakens the Mark.

There are many third parties using lightning bolts on clothing, including many with similar shapes to the Mark and accused uses. See, e.g., Defendants' Exhibits 397-408; Depositions of representatives from third party clothing companies Bandier, Saks, Bloomingdales and Rubie's Costumes (Messrs. Boyarsky, Cooper, Harter and Beige by deposition). The broad, common use of the bolt design by others for clothing, and Plaintiff's absence of any control over such use, also significantly weakens the Mark.

There are many third party uses of lightning bolts for a wide variety of things, beyond clothing, like icons, emojis and clip art that use bolt designs with similar shapes to the Mark. See, e.g., Defendants' Exhibits 409-411. Such common third-party use also weakens the Mark.

Thus, if valid, Plaintiff's Mark is very weak.

## 2. Defendants' Use of the Mark.

Defendant Aviator Nation was using the Mark before the first use date of Plaintiff's asserted '212 registration, thus Defendants have prior rights. See summary of supporting evidence in Section V.C. below.

Defendant Aviator Nation's goods are high end, expensive active wear clothing. See, e.g., See, e.g., Trial Exhibits 310-319, 339-362 (line sheets, ads, examples of clothing), 332-336, 355 369-379 (press, images of clothing, use of labels, signs on clothing stores, signs, packaging).; testimony of Mycoskie, Thompson of Aviator Nation.

Defendant Aviator Nation's goods bear Aviator Nation's marks AVIATOR NATION and AN LOGO  and are sold in Aviator Nation's retail stores and on its website which bear its marks and using labels, packaging and signage which bear Aviator Nation's marks. *Id.*

1  Defendant Aviator Nation's goods bearing its bolt designs are fair uses.   See

2  Section V.B. below.   See example accused clothing below (Trial Exhibits 339-362):

   

9  Plaintiff has not been using the Mark in interstate commerce since the end of

10  2014, thus, there are no actual goods, labels and other uses to compare.  Plaintiff has

11  no licensee that sells such goods in interstate commerce. See, Section (1) above.

12  ### 3.  Similarity of Plaintiff's and Defendants' Marks.

13  The asserted Mark and accused mark are different based on a side by side

14  comparison.  See excerpt below from Trial Exhibit 337 below of the asserted '212

15  registration and Defendant Aviator Nation's bolt design (two right most images):



23  See Section (1) above regarding the weakness of the Mark (e.g., Plaintiff has

24  not used the Mark in the U.S. since at least 2014; many other third-party registrations

25  and uses make it a very crowded field).

26  See Section (2) above regarding the uses of the Mark (e.g., Aviator Nation's

27  uses are for high end active wear, sold from Aviator Nation's stores with Aviator

28  Nation's marks, Plaintiff has not been in the market since at least 2014).

### 4. Actual Confusion.

Plaintiff has no evidence of actual confusion of its customers, because it has no products and no customers.   It and its alleged Mark are unidentifiable a source. See, Section (1) above.

Plaintiff's alleged evidence of actual confusion, certain Aviator Nation employee's recollections about Aviator Nation's customer inquiries, is inadmissible hearsay and unqualified expert opinions.  See, Defendants Motion in Limine No. 2.

Plaintiff's alleged evidence of actual confusion is also not evidence of actual confusion.   Plaintiff must demonstrate that any alleged confusion relates to the consumer's actual purchasing decisions. See *Lang v. Retirement Living Publ'g Co*., 949 F.2d 576, 583 (2d Cir. 1991) ("trademark infringement protects only against mistaken purchasing decisions and not against confusion generally"); *see also Miss World (UK), Ltd. v. Mrs. Am. Pageants, Inc*., 856 F.2d 1445, 1451 (9th Cir. 1988) (no actual confusion where there is no economic injury). The store employee recollections about customer inquiries do not reflect mistaken purchasing decisions. Further, there could be no economic injury because Plaintiff has not used the Mark in the U.S. since at least 2014.  See, Section (1) above.

In addition, questions to specify between two entities "indicates a distinction in the mind of the questioner, rather than confusion" and "demonstrate[s] that potential customers do not automatically associate" the mark-at-issue with plaintiff. *Duluth News-Tribune v. Mesabi Publishing Company*, 84 F.3d 1093, 1098 (8th Cir. 1996).   Questions regarding potential affiliation indicate customer was aware of different product sources.  *Fisher Stoves, Inc. v. All Nighter Stove Works*, 626 F.2d 193, 195 (1st Cir. 1980).  Most of the inquiries recollected reflect such distinctions.

Even if admissible evidence of actual confusion, compared to the thousands of customers that visit Aviator Nation's stores, the inquiries recollected are *de minimis*. In addition to establishing a direct connection between the allegedly confusing marks and the alleged confusion, Plaintiff must also present evidence of actual confusion

that is "more than de minimis." *R.J. Ants, Inc. v. Marinelli Enters., LLC*, 771 F.Supp.2d 475, 496 (E.D. Pa. 2011) (citing 2 MCCARTHY ON TRADEMARKS § 23.02[2][a]); see also *Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996); *Rockland Mortg. Corp. v. Shareholders Funding, Inc.*, 835 F.Supp. 182, 197 (D.Del. 1993); *Nutri/System, Inc. v. Con-Stan Indus.*, 809 F.2d 601, 606 (9th Cir. 1987) (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978)) (determining "that, in light of both parties' high volume of business, the misdirection of several letters . . . proved insignificant").  Aviator Nation has several thousands of customers per year.  The few alleged instances of confusion are minimal by comparison.  See, testimony of Mycoskie, Shyrer, Collucci, Willis of Aviator Nation.

### 5.  Defendants' Intent.

As further summarized in Section V.C. below, Defendants started using bolt designs on clothing in 2006, three years before Plaintiff's alleged first use based on the '212 and two years before the only U.S. license of the Mark identified by Plaintiff and to which it is not a party.  Plaintiff had nothing to infringe.  When Plaintiff later asserted infringement, in 2012, 2013 and 2016 and finally by this action in 2017.  Defendants denied infringement and pointed to their prior use and Plaintiff's abandonment or other absence of any rights it asserted.  See, Trial Exhibits (382-391); testimony of Mycoskie, Lee, Brussell.

See also Section (2) above regarding Defendants' manner of use (e.g., it is clear that these are Aviator Nation clothes).

### 6.  Marketing/Advertising Channels.

Defendants' accused goods are sold either retail in Aviator Nation's eight retail stores in California (6 in California), Colorado and Texas, retail at Aviator Nation's "pop-up" stores at festivals, retail via its website or wholesale via third party showrooms, distributors and retailers.   Defendants' consistently the AVIATOR NATION and other marks in connection with such sales, marketing and advertising.

1  Given that Plaintiff has had no licensee since at least 2014, Plaintiff neither sells,

2  markets nor advertises any goods in interstate commerce anywhere.  See, Sections

3  (1) and (2) above.  See image of Aviator Nation's store on Abbot Kinney in Venice

4  Beach (Trial Exhibits 370, 376):



11  **7.    Consumer's Degree of Care.**

12  Aviator Nation's clothing is high end active wear.  It is relatively expensive,

13  e.g., can be $200 per article.  It is sold in Aviator Nation stores and clearly marked

14  as Aviator Nation product.  Customers exercise sufficient care to avoid confusion.

15  See, Sections (1), (2) and (6) above.

16  Given that Plaintiff has had no licensee since at least 2014, it has no customers

17  or products to which to compare.

18  **b. Claim 2: California Unfair Competition and Trademark**

19  **Infringement.**

20  Plaintiff does no business with the Mark in California, so Plaintiff does not

21  compete with Defendants.

22  Plaintiff also has no California trademark registration for the Mark.

23  See also above in response to Claim 1.

25  **IV.    Summary statement of counterclaims and affirmative defenses**

26  **Defendants have pleaded and plan to pursue; Elements.**

27  **a.  Counterclaim 1 and related defenses – Fraud on the USPTO:**

28  Aviator Nation's first cause of action and Defendants' related affirmative

defenses (e.g., nos. 11 and 18) to Plaintiff's first cause of action are directed to the claim and defense that the '212 registration is invalid by virtue that ILC obtained the registration fraudulently, with the intent to mislead the United States Patent and Trademark Office ("USPTO").  A registration can be cancelled "at any time" if the registration "was obtained fraudulently."  15 U.S.C. §1064(3).

**Elements:**

(1) a false representation regarding a material fact;

(2) the registrant's knowledge or belief that the representation is false;

(3) the registrant's intent to induce reliance upon the misrepresentation;

(4) actual, reasonable reliance on the misrepresentation; and

(5) damages proximately caused by that reliance.

*Hokto Konoko Co. v. Concord Farms, Inc*., 738 F.3d 1085, 1097 (9th Cir. 2013).

### b. Counterclaim 2 and related defenses - Ornamentality, Fair Use:

Defendants assert invalidity of the '212 and any purported rights of Plaintiff in the Mark and noninfringement thereof on the grounds that the Mark is ornamental and Defendants' uses are fair.

**Elements:**

A defendant makes fair use of a mark when the defendant:

1.      used the mark other than to distinguish the defendants' goods from the plaintiff's and to indicate the source of the defendants' goods;

2.      used the mark fairly and in good faith; and

3.      used the mark only to describe or identify the defendant's goods as those of the defendants,' or merely ornamentally in association with the defendant's goods, and not at all to describe the plaintiff's goods.

9th Cir. Model Civ. Jury Instr. 15.24 (2017) (modified to include the discussion in the *Comment* and *Cairns v. Franklin Mint. Co*., 292 F.3d 1139, 1150 (9th Cir. 2002); modified further to account for defendants' "merely ornamental" defense and counterclaim (*see* Trademark Manual of Examining Procedure ("TMEP") §

1202.03).

### c.  Counterclaim 3 and related defenses - Abandonment:

Defendants assert invalidity of the '212 and any purported right of Plaintiff in the Mark and noninfringement thereof on the grounds of abandonment.

**Elements:**

The owner of a trademark abandons the right to exclusive use of the trademark when the owner:

1. discontinues its good faith use in the ordinary course of trade, intending not to resume using it;

2. acts or fails to act so that the trademark's primary significance to prospective consumers has become the product itself and not the producer of the product; or

3. fails to exercise adequate quality control over the goods sold under the trademark by a licensee.

9th Cir. Model Civ. Jury Instr. 15.22 (2017).

### d. Counterclaim 4 and related defenses - Lack of Control, Not Distinctive As a Source:

**Elements:**

Defendants assert that plaintiff's trademark is invalid because it lacks distinctiveness.

An owner of a trademark may not exclude others from using a symbol that is merely descriptive of goods, or merely ornamental, unless the symbol has acquired meaning because the prospective purchasers have begun to consider the trademark as an indication of the source of the goods. A trademark is merely descriptive if it is understood by prospective purchasers to describe only the functions, characteristics, use, or ingredients of the goods. A trademark is merely ornamental if it is merely a decorative feature does not identify and distinguish a provider's goods.

O'Malley, et al., Federal Jury Practice and Instructions, § 159:77 (6th ed.) (modified further to account for defendants' "merely ornamental" defense and

counterclaim no. 2, *supra*).

### e. Affirmative defense nos. 2-6, 9 - Laches, Acquiescence, Waiver, Estoppel, Statute of Limitations, Failure to Mitigate:

Defendants assert that Plaintiff unreasonably delayed in enforcing its rights and the delay caused prejudice to Defendants, so Plaintiff's purported rights are unenforceable.

**Elements:**

      1.     Plaintiff's unreasonable delay in enforcing its rights.

      2.     The delay caused prejudice to Defendants.

*Fitbug Limited v. Fitbit, Inc.*, 78 F.Supp.3d 1180 (N.D. Cal. 2015).

The district court "must weigh the plaintiff's delay and the resulting prejudice to the defendant to determine whether and to what extent laches bars the requested relief." *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1027 (9th Cir. 2018).

This weighing involves application of a multi-factor test, including: (1) the strength and value of Plaintiff's trademark, (2) Plaintiff's diligence, (3) harm to Plaintiff if relief is denied, (4) whether Defendants acted in good faith ignorance, (5) whether the parties compete, and (6) whether Defendants suffered any harm because of the delay in filing suit. See *Id*. at 1027 (applying *E-Systems*[5] factors).

## V. Brief Summary of Defendants' Key Evidence in Support of Counterclaims and Affirmative Defenses.

### a. Counterclaim 1 and related defenses: Fraud on the USPTO.

There were numerous false representations of material fact. The specimen accepted by the USPTO to support application for and the '212 registration had not been used in commerce on all of the goods claimed as of the use dates represented by Plaintiff, or its purported agents, in the '212 registration and the application

---

[5] *E-Sys., Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983).

therefore.  Plaintiff, through Mr. Lawrence Lee, submitted the specimen and statement of use with the intent to mislead the USPTO for the purposes of obtaining the registration.

In connection with the application for the '212 registration, the applicant and registrant represented under penalty of perjury that its alleged mark was used in commerce in connection with all the goods claimed and as of certain dates of first use and first use in commerce (May 28, 2009).  Those representations were false, as Plaintiff did not use the alleged mark in association with all the goods listed in the application and did not use the alleged mark on all of the goods listed in the application as of the asserted May 28, 2009 first use dates based on the specimens submitted to and accepted by the USPTO in issuing the '212 registration.  Plaintiff's false representations were made with the intent to mislead the USPTO for the purposes of obtaining the registration.

Plaintiff, including Mr. Lee, knew the representations were false for several reasons.  Their intent was to induce reliance upon the misrepresentation, which the USPTO did in issuing the registration.  Defendants and the public have been damaged by that reliance as evidenced by this action and Defendants having to defend against Plaintiff's claims, including as set forth in the November 13, 2018 report of Larry Maxham, Trial Exhibits 429-430, 436-438 (emails produced by ILC regarding Mr. Lee's inquiries to TMG regarding specimens of use and dates), 439-450 (USPTO prosecution file history for application for '212 registration and related applications), as further set forth in Appendix A attached.

### b.  Counterclaim 2 and related defenses: Ornamentality, Fair Use.

The '212 registration and ILC's asserted trademark rights are invalid by virtue of the alleged mark being merely ornamental.

Subject matter that is merely a decorative feature does not identify and distinguish the asserted owner's goods and, thus, does not function as a trademark. A decorative feature may include words, designs, slogans, or trade dress. This matter

is merely ornamentation and, therefore, does not function as a trademark, as required by 15 U.S.C. §§1051, 1052, and 1127.

The size, location, and dominance of the proposed mark, as applied to the goods, may be used to determine whether ornamental matter serves a trademark function. *In re Hulting*, 107 USPQ2d 1175, 1177-79 (TTAB 2013). A small, neat, and discrete word or design feature may create the commercial impression of a trademark, whereas a larger rendition of the same matter emblazoned across the front of a garment may be perceived merely as a decorative or ornamental feature of the goods. However, a small, neat, and discrete word or design feature will not necessarily be perceived as a mark in all cases. Moreover, the size of the mark on clothing is only one consideration in determining ornamentality or nonornamentality. *In re Lululemon Athletica Can. Inc.*, 105 USPQ2d 1684, 1689 (TTAB 2013).

Since the end of 2014, upon termination of the TMG license, Plaintiff has not used the Mark at all in commerce, and thus it has no use to assert during that time. See, Section (1) of Section III. Above.

To the extent Plaintiff has used the Mark in U.S. commerce, its use has been ornamental. That is, the alleged mark as used or allegedly used in connection with the claimed goods, including clothing, is merely a decorative or ornamental feature of such goods and would not be perceived as a mark by the purchasing public.  The alleged mark has not otherwise acquired distinctiveness and is thus unenforceable.

For example, as reflected in the prosecution history of the '393 application, the USPTO found Plaintiff's purported uses of bolts on the pocket area of shorts as ornamental and rejected such specimens of use proposed by Plaintiff.  Trial Exhibit 447.

By further example, images of purported clothing licensed by Plaintiff for sale in the U.S. from approximately 2009 to 2014 reflect ornamental uses and clothing labels that do not include the Mark (rather, other composite marks with bolts, for example).  Trial Exhibits 75, 78, 79, 82.

To the extent Plaintiff relies on hang tags for use, there is no evidence of hangtags used before 2013, presuming any were used for any of the goods in the '212 or otherwise for clothing.   Trial Exhibits 429-430, 436-438 (emails produced by ILC regarding Mr. Lee's inquiries to TMG regarding specimens of use and dates and alleged specimens as attachments),

Further, even Plaintiff will contend that some of purported infringing uses are ornamental, and Defendant Aviator Nation's clothing is marked with its own marks and sold in its own stores and via its own website.  Defendants take no actions that would suggest sponsorship or endorsement by Plaintiff.   Defendants' acts or omissions were made fairly and were justified.   See, Section C above at Sections (1) and (2).

Plaintiff argues, because it needs to, that Aviator Nation's uses of its bolt designs on clothing as early as 2006, and continuous uses since then, were "merely ornamental," non-trademark uses. If Plaintiff were to argue otherwise, then Aviator Nation's uses prior to the '212 registration issuance could not constitute trademark infringement, and could not enjoined. *See* 15 U.S.C. § 1115(b)(5). However, if those same designs in 2006, which Aviator Nation still uses today, were "merely ornamental" in 2006, then they are still "merely ornamental" now, and "merely ornamental" uses are non-trademark uses which cannot, as a matter of law, confuse consumers as to the source of Aviator Nation's clothing. *See New Kids on the Block v. News America Pub., Inc.,* 971 F.2d 302, 307 (9th Cir. 1992) ("Cases like these are best understood as involving a non-trademark use of a mark - a use to which the infringement laws simply do not apply…"); *see also Interactive Products Corp. v. a2z Mobile Office Solutions, Inc.,* 326 F.3d 687, 695 (6th Cir. 2003) (citing *New Kids on the Block* with approval and stating "[I]n this case, there is a preliminary question about whether defendants are using the challenged mark in a way that identifies the source of their goods. If defendants are only using Plaintiff's alleged Mark in a 'non-trademark' way — that is, in a way that does not identify the source of a product —

then trademark infringement and false designation of origin laws do not apply.") For these reasons, Plaintiff cannot state a claim against Defendants for trademark infringement. *Id.*

### c. Counterclaim 3 and related defenses: Abandonment and Prior Use.

Evidence of non-use of the mark for three consecutive years is prima facie evidence of abandonment. See 15 U.S.C. § 1127; *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 411-12 (9th Cir. 1996). When the defendant proves the necessary consecutive years of non-use, the burden shifts to the plaintiff to go forward with evidence to prove that circumstances do not justify the inference of intent not to resume use. *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 99 (5th Cir.1983).

As noted above, Plaintiff has not had a U.S. license of the Mark since at least 2014, which is far more than three years ago. See, Section III. above at Section (1). Indeed, Plaintiff has no basis to continue to maintain the '212 registration, because it cannot submit requisite proof of continued use pursuant to 15 U.S.C. §1058. Such proof is due within six years of registration, which will be August 13, 2019. See, '212 at Trial Exhibit 302 and 15 U.S.C. §1058(a)(1). Plaintiff did not intend to resume using the alleged Mark in connection with clothing or other goods, assuming Plaintiff ever did use the alleged Mark in such a manner.

Presuming Plaintiff made use of the Mark in commerce before 2009, Plaintiff abandoned any rights it or its alleged predecessors had and cannot provide a sufficient showing of intent to resume use. For example, Plaintiff did not use the Mark in commerce since from at least 2004 to 2009, if not earlier. See, testimony of Lee.[6] Thus, abandonment is presumed as of at least 2007, if not earlier. This is substantial evidence of abandonment and lack of intent to resume use. Further from 2000 to

---

[6] Q And the same would be true for clothing, if ILC had no license before TMG, therefore, ILC cannot prove use of the Mark through a licensee or even by its own direct use in the U.S. in connection with clothing before the TMG license; right?
A Authorized use, no, because we didn't license anything before TMG that I'm aware of authorized, but I'm sure -- I believe there are unauthorized use, maybe.
Lee Depo. at pp. 64:13-65:10.

2009, in addition to the absence of any license or proof of sales using the Mark in commerce, several of Plaintiff's and its purported predecessors' purported U.S. trademark registrations and applications for bolt designs were cancelled by the USPTO for lack of maintenance and requisite proof of continued use by Plaintiff or its purported predecessor or abandoned by Plaintiff. See, Trial Exhibits 451-466. The same pattern of abandonment has continued since 2009 to the present.

An owner of a registered trademark also may not exclude others who began using a confusingly similar trademark in a geographic area, without knowledge of the owner's prior use of a similar trademark elsewhere, and before the owner had applied for registration of the trademark, and continued to use the mark in such areas. 15 U.S.C. § 1115(b)(5).

As explained in above, Plaintiff cannot maintain a claim against Defendants for trademark infringement if Aviator Nation's 2006-2009 uses of its bolt designs on clothing qualify under 15 U.S.C. § 1115(b)(5). Trial Exhibits 310-340 (examples of use from 2006-2009), Trial Exhibit 1 (excerpts from Complaint, Plaintiff admits Defendant Aviator Nation's prior use at ¶¶ 25-28 (same in proposed amended complaint)); testimony of Paige Mycoskie, Reed Thompson, Dave Mason of Aviator Nation. For example, illustrations of such uses from 2006 to 2009 are summarized in Appendix C attached hereto (excerpted from Trial Exhibits 310-319). For example, below is a photo of Ms. Mycoskie from 2006 at a street fair in Venice Beach with a friend with an early Aviator Nation shirt with a bolt at the front pocket space (see many additional examples at Appendix C):



1    Defendants will present evidence of invoices and purchase orders reflecting

2    sales of such clothing in such time frame.  See, Trial Exhibits 320-331.  Defendants

3    will present evidence of magazine articles and other press about such use in this time

4    frame.  Trial Exhibits 332-335.

5    Since those 2006-2009 uses by Aviator Nation are the same as their uses today,

6    Plaintiff has to claim all of those uses are "merely ornamental" such that Aviator

7    Nation cannot rely on the "innocent local user" defense in Section 1115(b)(5).

8    However, by making those concessions, Plaintiff is admitting that consumers would

9    not mistake Aviator Nation's uses of its bolt designs as trademark-type, source-

10   identifying uses, which wholly disproves their claims of confusion at the foundation

11   of their trademark infringement and unfair competition claims. *See New Kids on the*

12   *Block* and *Interactive Products Corp., supra.* Plaintiff cannot have it both ways:  if

13   Aviator Nation's 2006-2009 uses of its bolt designs on clothing were and are "merely

14   ornamental," then those uses cannot qualify as infringing uses today; but, if those

15   uses were not "merely ornamental," then Aviator Nation's 2006-2009 uses of its bolt

16   designs on clothing constitute undisputed evidence that they were qualifying uses

17   under Section 1115(b)(5) such that Defendants cannot be held liable for trademark

18   infringement or unfair competition as they are "innocent prior users," and they are

19   entitled to continue those uses under applicable law.

20   "It is axiomatic in trademark law that the standard test of ownership is priority

21   of use. To acquire ownership of a trademark it is not enough to have invented the

22   mark first or even to have registered it first; the party claiming ownership must have

23   been the first to actually use the mark in the sale of goods or services." *Sengoku*

24   *Works, Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996); see also

25   *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 756 (9th Cir. 2006) ("Trademark

26   rights are acquired by the party that first uses a mark in connection with the sale of

27   goods."); 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND

28   UNFAIR COMPETITION § 16.1 (4th ed. & 2010 Supp.) ("The basic rule of

trademark ownership in the United States is priority of use"; "All common law and registration rights are buil[t] upon this foundation of first-in-time, first-in-right"). "The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." *Brookfield Communs., Inc. v. W. Coast Entm't Corp.*, 174 F. 3d 1036, 1047 (9th Cir. 1999).

Defendant Aviator Nation used and has continued to use the accused bolt designs in commerce on clothing since at least 2006, before Plaintiff's use in commerce on clothing and before the 2009 first use date in the '212. *Id*.

Depending on Plaintiff's contentions, Defendant Aviator Nation's early and continued include what qualify as trademark uses, including for example use of small lightning bolts on pocket areas and consistent placement and use of larger lightning bolt designs on the front of hats, fronts and backs of shirts and sides of pants.   Trial Exhibits 310-319.

At the very least, based on use beginning in 2006 and continuing through 2009, and thereafter, Defendant Aviator Nation would have the right to use the mark within the areas of California, New York, Michigan, South Carolina and Texas and zones of natural expansion therefrom, including for example Nevada, Arizona, Oregon, Washington and Hawaii areas on the West Coast and Connecticut, Delaware, Maryland, Massachusetts and Pennsylvania areas on the East Coast. See, Trial Exhibits 320-331 (2006-2009 invoices, purchase orders).

### d. Counterclaim 4 and related defenses: Lack of Control, Not Distinctive As a Source.

The '212 registration, and any unregistered right now asserted,[7] is invalid by

---

[7] Following the close of discovery, Plaintiff sought leave to amend its complaint to allege new "unregistered" trademark rights in violation of *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs.*, 897 F.3d 1008, 1024-25 (9th Cir. 2018). These claim amendments should not be permitted as it would require discovery to be re-opened, and Defendants to revise their entire defense strategy. Defendants will brief same in conjunction with their opposition to Plaintiff's *Motion for Leave to Amend* (Dkt. No. .71).

virtue that Defendant Aviator Nation, and third parties, used and/or have continued to use bolts designs on clothing sold in interstate commerce before Plaintiff's use in commerce on clothing, the alleged mark is not distinctive as a source of Plaintiff or its goods including clothing, and the purported mark is not, or cannot, be owned or controlled by Plaintiff for at least use in connection with clothing, including to prevent trademark, ornamental and other fair uses by Aviator Nation and others.  See, Section V.D. above, Trial Exhibits 403-410.

A mark's strength is equivalent to its distinctiveness.  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992).  The Ninth Circuit utilizes a two-prong test of mark strength. See *GoTo.Com, Inc. v. Walt Disney Company*, 202 F.3d 1199, 1207 (9th Cir. 2000) ("'strength' of the trademark is evaluated in terms of its conceptual strength and commercial strength").  Generally, use of the second prong is appropriate in cases of descriptive or suggestive marks. See, e.g., *Japan Telecom. Inc. v. Japan Telecom America Inc.*, 287 F.3d 866, 873–74 (9th Cir. 2002).

A trademark in a crowded field (measured by concurrent use, not merely registration) can be weak, and therefore entitled to less protection.  *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F.Supp. 2d 1214, 73 U.S.P.Q.2d 1287 (C.D. Cal. 2004), aff'd, 114 Fed. Appx. 921 (9th Cir. 2004).  When "the marketplace is replete with products using a particular trademark[]," it "indicates not only the difficulty in avoiding its use but also, and directly, the likelihood that consumers will not be confused by its use." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002).  One of the predominant trademark law treatises states the crowded field issue this way: "[I]n a 'crowded' field of similar marks, each member of the crowd, is relatively 'weak' in its ability to prevent use by others in the crowd." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 11:85 at 11-163 (4th Ed. 2001).  "Evidence of widespread third-party use, in a particular field, of marks containing a certain shared term is competent to suggest that purchasers have been conditioned to look to other elements of the marks as a means of distinguishing the

source of the goods or services in the field." *In re Broadway Chicken, Inc.*, 38 U.S.P.Q.2d 1559, 1565-66 (T.T.A.B. 1996) (in view of third-party uses and registrations of "Broadway" for restaurant services, confusion was not likely between BROADWAY CHICKEN and BROADWAY PIZZA and BROADWAY BAR AND PIZZA). Accordingly, confusion is unlikely here because consumers are able to discern even small differences between Defendants bolts and the asserted Mark.

"If the evidence establishes that the consuming public is exposed to third-party use of similar marks on similar goods, this evidence 'is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection.'" TMEP § 1207.01(d)(iii), citing *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1373 (Fed. Cir. 2005). Here, the Mark is entitled to a narrow scope of protection due to the presence of many examples of use of the mark for various types of clothing.

Plaintiff also failed to control the use of its purported licensee, TMG, and the numerous third parties that use bolt designs on clothing throughout the U.S. For example, there is no evidence that Plaintiff had any involvement in the TMG license, and the evidence indicates that HTIL exercised essentially no control and did not review and approve products or uses in any manner. Trial Exhibits 304-309 (license agreement and related documents), 429-430, 436-438 (emails produced by ILC reflecting 2011-2013 emails between HTIL and TMG, not ILC). Such bolt designs are widely used on clothing and other goods and services, such as social media and smart phone applications. Trial Exhibits 409-411. Further, if it ever did any such business, Plaintiff ceased doing any business in the U.S. in connection with the Mark in 2014. Essentially no consumers in the U.S. have heard of Plaintiff. Assuming consumers have heard of "LIGHTNING BOLT," that is not at issue in this case-- Plaintiff is not the Original "LIGHTNING BOLT" it is trying to "casually conflate" itself with (*see Fleischer Studios, Inc. v. A.V.E.L.A., Inc.,* 925 F. Supp. 2d 1067, 1069 n.1 (C.D. Cal. 2012); Plaintiff has established no chain of title to that mark, or any

related marks; and Plaintiff's and Defendants' evidence proves that even the Original "LIGHTNING BOLT" brand was abandoned before Plaintiff's intra-company assignment from 2004. The mark here is a simple lightning bolt design, incapable of being distinctiveness under the circumstances. Thus, the asserted mark does not distinguish Plaintiff as a source.

### e. Affirmative Defense of Laches.

Plaintiff was aware of Aviator Nation's alleged uses and alleged infringement by at least January 2010, along with numerous other third parties uses of bolt designs on clothing before and after 2010 continuing to the present, and took no legal action until October 2017, after it had ceased its business in the U.S. in connection with the Mark in early 2015. Plaintiff's delay has been unreasonable, and the delay has been highly prejudicial to Defendants. Here is a brief chronological summary:

1. In January 2010, Plaintiff had notice of Aviator Nation's alleged infringement. See Trial Exhibit 381, 480 (notice letter to HTIL from TMG, Plaintiff's response to Interrogatory No. 6).

2. In 2012, through its U.S. licensee, Plaintiff demanded that Aviator Nation stop using bolt designs on clothing through its purported licensee, which Aviator Nation refused. Trial Exhibit 382; testimony of Lee, Mycoskie, Brussell (former CFO of Plaintiff's former U.S. licensee).

3. In 2013, through its U.S. licensee, Plaintiff again demanded that Aviator Nation stop using a bolt design. Aviator Nation did not respond. Trial Exhibits 383-386; testimony of Lee, Mycoskie, Brussell.

4. In 2013, the '212 registration issued. Trial Exhibit 302.

5. In 2013, through its U.S. licensee and HTIL, Plaintiff expressly conferred internally regarding whether to pursue an action against Aviator Nation and did nothing further. Trial Exhibit 387.

6. At the end of 2014, Plaintiff's only license in the U.S. terminated. See Section III. Above at Section (1).

7.     In 2016, Plaintiff made another demand to Aviator Nation.  Trial Exhibit 388.

8.     On October 31, 2017, Plaintiff filed this action.  See Dkt. No. 1.

Unreasonable delay is established by the applicable statute of limitations alone.  The applicable statute of limitations is not possibly more than four (4) years. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc*., 304 F.3d 829, 838 (9th Cir. 2002) (discussing and adopting 3-year period conceded by the parties); *see also Internet Specialties W., Inc. v. Milon-Digiorgio Enters.,* 559 F.3d 985, 990 n.2 (9th Cir. 2009) (discussing and adopting 4-year period agreed to by the parties). The '212 registration issued in August 2013, and the Complaint was not filed until more than four years later in October 2017.

Here, Plaintiff was aware of Aviator Nation's alleged infringement by January 2010, and Plaintiff's remaining causes of action presumably arose by then, yet Plaintiff waited over seven years to file a civil action.  It was unreasonable for Plaintiff to delay for over seven years, and Defendants would be substantially prejudiced by any enforcement of Plaintiff's causes of action.

For example, Defendants would be substantially prejudiced in view of the resources expended and value obtained from twelve years of growth, including from one to eight retail stores, and thousands to millions in dollars of annual sales, of which sales of its bolt clothing have been a part.  See, Trial Exhibits 363-365 (sales records, financial statements); testimony of Mycoskie, Thompson and Mason of Aviator Nation.

Also, the delay has caused Defendants substantial difficulty and expense in defending themselves from Plaintiff's long delayed claims. *Id*.

Plaintiff has done nothing to enforce its purported rights for years and years, and it would be unfair and needlessly prejudicial to Defendants to enforce any of Plaintiff's causes of action.  *Id*.; testimony of Lee.

Similarly, for the reasons set forth above regarding defenses of laches and

1   statutes of limitations, Plaintiff's causes of action are all barred due to Plaintiff's

2   consent to, acquiescence of, waiver of and estoppel as to claims against Defendants'

3   alleged uses.  *Id.*

4   **f.  Affirmative Defense of Failure to State a Claim.**

5   As to Plaintiff's first cause of action, it recently disclosed that it intends to

6   abandon its counterfeiting claim, which was unwarranted and failed to state facts

7   sufficient to constitute such a cause of action against Defendants.  So, Defendants

8   move their summary of evidence against counterfeiting claims to Appendix B.  Also,

9   accordingly, no injunctive relief under 15 U.S.C. § 1116 and no treble or statutory

10   damages under 15 U.S.C. §1117 for counterfeiting are available to Plaintiff.

11   As to Plaintiff's third cause of action (Claim 2 above) for California unfair

12   competition and trademark infringement, Plaintiff fails to state facts sufficient to

13   constitute such a cause of action against Defendants.  Plaintiff has no applicable

14   California trademark registration.  Also, Plaintiff does no business in California, so

15   Plaintiff does not compete with Defendants.

16   **g.  Affirmative Defense of Lack of Damages.**

17   Plaintiff's causes of action are also barred in whole or in part due to Plaintiff's

18   lack of damages.  Indeed, Plaintiff recently disclosed that it will only seek profits as

19   damages from the November 7, 2019 date of service of the complaint (see also, Dkt.

20   No. 71), so actual damages should not be at issue.  Further, willfulness is a

21   prerequisite for disgorgement of a trademark infringer's profits.  *Stone Creek, Inc. v.*

22   *Omnia Italian Design, Inc*. 875 F.3d 426 (9th Cir. 2017). So, Plaintiff would have to

23   clear that hurdle first to even seek profits from Defendants.

24   Further, 15 U.S.C. §1117 provides that any award of profits "shall constitute

25   compensation and not a penalty."  Plaintiff has not been doing business in connection

26   with the Mark since at least the end of 2014, thus it could not show any need for

27   compensation since then.

28   In fact, Plaintiff has failed to come forth with a statement of actual damages or

any evidence of actual damages, whether lost profits, price erosion, reasonable royalty, or other form of alleged actual damages, from before that time.  It should be precluded from attempting to offer such evidence at trial.  See Defendants' Motion in Limine No. 5.

Plaintiff acknowledges that TMG paid royalties to HTIL pursuant to the 2008 license agreement, so HTIL (purportedly acting for Plaintiff) received the expected compensation.  So, actual damages should not be available to Plaintiff, and Plaintiff apparently now does not seek such damages or damages in the time period of the license.  Trial Exhibits 305, 429-438.

Also, to the extent Plaintiff seek damages based on the '212 registration, that registration issued on August 13, 2013 so no damages could accrue before then, and the damages period would be subject to notice requirements of 15 U.S.C. §1111.  Since Plaintiff indicates it will only seek profits as of the October 31, 2017 filing of its Complaint, and Defendants were using lightning bolt designs on Aviator Nation eleven years earlier, and three years before Plaintiff's claimed first use, statutory notice will apparently before Defendants' first use (which was simply continued thereafter) will still be an issue.

As to Aviator Nation's profits, assuming Plaintiff could establish willful infringement, none should be awarded in the circumstances, given Plaintiff's laches and the "no penalty" language in the Lanham Act.

Also, Aviator Nation's profits from retail sales should not be at issue, since Plaintiff has not been in the U.S. market since 2015 and HTIL received royalties from TMG before that.  See, testimony of Lee.

Aviator Nation's profits from wholesale sales should not be at issue, since Plaintiff cannot and has not shown any relationships with such customers of Aviator Nation to show that it or its licensee, if it had one, could or would have made the sales instead.

Plaintiff had evidence of actual damages relevant to its request for an award of

Defendants' profits, Plaintiff did not provide discovery on that so they should be precluded from attempting to present such evidence so at trial. See, Defendants' Motion in Limine No. 5. Further, assuming Plaintiff would try to show that it was not able to get a licensee after 2014 because of Defendants, Plaintiff could not rely on the expired TMG license as a comparable license of what it could have obtained. That license was for a broader suite of alleged trademark rights and licensed products than the bolt design and clothing at issue and also covered geographic areas beyond the United States, such as Canada. Trial Exhibit 304 (agreement). So, it would not be comparable.

Similarly, no act or omission of Defendants was a substantial factor in bringing about the damages alleged, nor was any act or omission of either Defendant a contributing cause thereof. Any alleged acts or omissions by Defendants were superseded by the acts or omissions of Plaintiff and its licensee TMG, including those described in the paragraph above, as well as Plaintiff's failure for years and years to enforce its purported rights against Defendants and the numerous other third parties that use bolt designs on clothing, which were the independent, intervening, and proximate causes of the damage or loss allegedly sustained by Plaintiff.

Similarly, for the reasons above, Plaintiff failed to take reasonable steps to mitigate, alter, reduce, or otherwise diminish its alleged damages, and accordingly, is barred from recovery of any damages that might have been prevented by such mitigation.

### h.  Affirmative Defense of Unclean Hands and Trademark Misuse.

Plaintiff's causes of action are barred because Plaintiff commenced this action for the primary purpose of wrongfully harassing, intimidating, threatening and/or coercing Defendants and competition in the market.

Given this, and given Plaintiff's laches, periods of abandonment, absence of actual use, lack of control over the Mark, failure to attempt to enforce its purported rights against others except only against Defendants after seven years of notice,

fraudulent procurement of the '212 registration, and insistence in pursuing this action nevertheless, Plaintiff's causes of action are barred by the doctrine of unclean hands and trademark misuse.

## VI.     Identification of any anticipated evidentiary issues, together with Defendants' position on those issues.

In accord with issues raised in the pending motions in limine, Defendants anticipate that there will be substantive evidentiary issues as to the following:

1.     Plaintiff indicates that it intends to try to call as many as fifteen Aviator Nation employees to testify about customers' alleged inquiries at its stores as to whether there is a connection between Aviator Nation and "Lightning Bolt."  As set forth in Defendants' Motion in Limine No. 2, such evidence should be inadmissible, but in any event, there will be no good reason to attempt to call so many witnesses at trial.  Plaintiff even seeks to have Aviator Nation produce employees that live and work outside of this District, and Defendants' position is that this is excessive, wasteful and beyond the scope of trial subpoena.

2.     Plaintiff intends to present evidence as if it is the successor in interest to the "Lightning Bolt" brand from the 1970's and to otherwise link itself and its purported trademark goodwill to that "brand" from that era (yet to be clearly defined). As set forth in Defendants' Motion in Limine No. 4, Plaintiff has identified no trial exhibits that would establish chain of title to or continuous use in commerce of the asserted Mark back to the 1970's, and it cannot claim that without having such proof. Further, the '212 registration at issue claims first use in 2009, issued for registration in 2013 and does not extend back to the 1970's.  Defendants' maintain that Plaintiff should be precluded from presenting such evidence.  Further, without such evidence, the opinions of Mr. Jenks and Mr. Mignogna (and purported lay witness testimony) are irrelevant (and they should be excluded for additional reasons as well).  See also Defendants' Motions in Limine Nos. 1 and 3.

3.      Based on its proposed amended complaint, Plaintiff intends to present evidence of actual damages, yet it has not disclosed such evidence.  Plaintiff also intends to present evidence of actual damages, but without quantifying it, presumably as support for either a claim to Defendants' post November 7, 2017 profits or to support an injunction.  However, as set forth in Defendants' Motion in Limine No. 4, Plaintiff has not disclosed any evidence of actual damages in discovery and should be precluded from doing so at trial.

4.      Also, based on its proposed amended complaint, Plaintiff intends to rely on evidence of U.S. trademark registrations other than the asserted '212 registration, and for marks other than the "Lightning Bolt design" mark at issue.  Defendants' position is that Plaintiff should not be permitted to do so. As set forth in Defendants' opposition to Plaintiff's motion for leave to amend (filed March 11, 2019, Dkt. No. 71), these are new and broadening allegations raised on the eve of trial.  Plaintiff should not be permitted to rely on them now at trial as proof of use or intent to resume use.  Plaintiff's position throughout discovery has been that it has one and only one U.S. license and that was from 2008 to 2014.  It would seek to point to these other registrations and the statements of continued use filed with the USPTO as evidence of use and intent to use.  Significantly, it would attempt to do so for years in 2003, 2004, 2005 and 2007 (see, Trial Exhibits 113, 116, 120, 124, 126, 127, 133). However, until now, that has been a period in which Plaintiff conceded no license and no use during discovery.  Also, Plaintiff has put these on its trial exhibit list after having not produced them in discovery or relying on them in its discovery responses about use.  Trial Exhibits 101-134.  Defendants maintain they should be stricken on that basis alone, although there is some overlap of these with the file histories that Defendants identified in their exhibit list as evidence of abandonment of so many registrations and applications by Plaintiff over the years.  Trial Exhibits 451-466. Further, all but one of registrations are for marks like the "Lightning Bolt design" mark at issue (others are for LIGHTNING BOLT, other designs with bolts, etc.), so

Plaintiff should not be permitted to try to use the other registrations of other marks as proof of use or intent to use the Mark at issue.  Plus, if Plaintiff can use other registrations that way, then there is a substantial danger that the jury would be misled and confused that Plaintiff is asserting those registrations and marks as well.  In addition, that one registration was cancelled in 2009.  Yet, Plaintiff wants to use it as evidence of intent to use in 2005, based on a statement of use filed with the USPTO.  Trial Exhibits 126-127.  Plaintiff should not be permitted to do so, given its prior nondisclosure, late attempt to add this as evidence, its prior responses in discovery that Plaintiff and its alleged predecessor in interest had no license for the Mark from at least 2003 and 2008 (again, it has produced only the one license).   So, Plaintiff would be pointing to the unrelated trademark prosecution histories as evidence of use, while having no license as evidence that they controlled the use.  Such purported evidence of use or intent to resume use is unsupported, speculation and hearsay.

Defendants also anticipate <u>procedural and judicial economy issues</u> with the following:

1.     Use of deposition testimony: Both sides intend to introduce evidence by deposition testimony.  All but one deposition is videotaped.  Defendants propose to read the testimony into evidence in a jury trial and understand Plaintiff intends to do the same.  Defendants would be amenable to providing a written summary of certain deposition testimony, such as testimony of third parties that use lightning bolts on clothing (Bandier, Saks, Bloomingdales, Rubies' Costumes).

2.     Use of discovery responses; Defendants intend to introduce interrogatory and request for admission responses.  (Trial Exhibits 476-504).

3.     Consolidated documentary evidence and introduction of articles of clothing: There are several exhibits that comprise collections of documents for a given time or subject or that comprise actual clothing, such as:

- Evidence of Aviator Nation's use from 2006-2009:

    Aviator Nation's annual line sheets from 2006 to 2009 (Trial Exhibits 314-319);

Aviator Nation invoices and purchase orders from 2006 to 2009 (Trial Exhibits 320-331); and

Press about Aviator Nation's use of bolts from 2006-2009 (Trial Exhibits 332-335).

- Evidence of Aviator Nation's use from 2010-2018:

    Aviator Nation's line sheets from 2010 to 2018 (Trial Exhibits 341-350);

    Examples of Aviator Nation's bolt clothing for women, men and kids (Trial Exhibits 351-355); and

    Aviator Nation press, press packages and images of stores, signs and packaging (Trial Exhibits 370-376).

- Evidence of actual Aviator Nation clothing (Trial Exhibits 339-340, 356-362);

- Evidence of Aviator Nation's other (non-bolt) designs and of its labels, packaging, promotions, stores and signs for perspective on what it and how it sells (Trial Exhibits 369-376);

- Evidence of third party uses of bolts on clothing, including actual clothing (Trial Exhibits 403-410);

- Evidence of third-party registrations for bolt for on clothing (Trial Exhibits 412-428);

- Evidence of Paskowitz and Mycoskie 2012 email dialogue (Trial Exhibit 382); and

- Evidence of abandoned and cancelled U.S. trademark applications and registrations by Plaintiff (Trial Exhibits 451-466).

Defendants' position is that counsel seek agreement on ways to present such evidence to the jury, including by consolidated exhibits and jury notebooks.

## VII.    Identification of any issues of law, such as the proper interpretation of a governing statute, which are germane to the case, together with Defendants' position on those issues.

Apart from those listed above, none are known to Defendants at this time.

## VIII.    L.R. 16-4.3 Bifurcation of Issues.

Defendants do not request bifurcation of issues. Defendants object to Plaintiff's request for bifurcation, which will cause needless extra burden on the

1  Court, jury, witnesses and parties.

2

3  **IX.  L.R. 16-4.4 Jury Trial.**

4  Both Plaintiff and Defendants have made jury demands.  Most issues are

5  triable to a jury as a matter of right, and there are equitable issues that do not require

6  or necessarily require a jury, although various issues and evidence will overlap

7  among jury triable and non-jury triable issues such that all issues should be tried to a

8  jury.  Defendants are likely willing to waive a jury trial, but Plaintiff does not appear

9  willing to do that.

10

11  **X.  L.R. 16-4.5 Attorneys' Fees.**

12  Pursuant to the Lanham Act, reasonable attorney fees may be awarded by the

13  court in "exceptional cases" to the prevailing party. *See* 15 U.S.C. § 1117(a). The

14  Ninth Circuit has held that this requirement is met by a defendant when the case is

15  either "groundless, unreasonable, vexatious, or pursued in bad faith." *See Cairns,* 292

16  F.3d at 1156 (citations omitted). Here, Defendants and their counsel have devoted

17  substantial time, effort and expense to defending against Plaintiff's claims, and

18  responding to their vexatious discovery tactics, despite the obvious flaws, both

19  legally and factually, in their claims as set forth above. Both the lack of merit, and

20  the Plaintiff's and its counsel's conduct throughout discovery, and beyond, warrant

21  an award of attorneys' fees to Defendants.

22

23  **XI.  L.R. 16-4.6 Abandonment of Issues.**

24  Plaintiff has sought leave to file an amended complaint which appears to

25  abandon certain claims and issues, such as counterfeiting, actual damages and any

26  claim for Defendants' profits before November 7, 2017. For Defendants' part, they

27  have abandoned no issues.

28

1

DATED:  March 18, 2019                LEWIS KOHN & WALKER, LLP

2

3                                        By:  /s/ *Kent M. Walker*

4                                        KENT M. WALKER
                                         kwalker@lewiskohn.com
5                                        Attorneys for Defendants,
                                         AVIATOR NATION, INC., and PAIGE
                                         MYCOSKIE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX A**
**SUMMARY OF FACTS REGARDING**
**MISREPRESENTATIONS TO THE USPTO**
**(See, testimony of Lee and Maxham and Trial Exhibits 302-305, 381, 429-430,**
**436-458, 464, 502, 511, 514, 517-518)**

1.      For example, as a backdrop to Plaintiff's intent, before filing the '399 application in 2009 (which led to the '212 in 2013) (Trial Exhibits 302, 446 (also 130)), ILC had abandoned numerous U.S. trademark registrations and applications for bolts and other bolt marks in its purported portfolio.  This indicates nonuse and abandonment of use.  This is also consistent with Plaintiff's lack of evidence of and admissions of nonuse of the Mark in interstate commerce before TMG's use after the 2008 license.  For example, while Plaintiff's purported predecessor apparently renewed the '609 registration in 1998, it proceeded to let numerous registrations for bolts go abandoned in 2002.  See for example Reg. Nos. 1,151,095 for sandals, 1,163,645 for jewelry and skateboards, 1,670,741 for eyeglasses, 1,676,857 for clothing (Trial Exhibits 453, 452, 456, 458, 502 (admissions to RFA's)).  It filed application no. 78835684 in 2006 for a bolt design for eyeglasses, but it abandoned that application in 2007 (Trial Exhibit 464).

2.      Further, if the Mark was in use or on verge of reuse at the 8/15/18 time of expiration of the '609, then presumably Plaintiff would have renewed the '609 registration.  Ultimately, instead, Plaintiff claims first use for clothing and all of the other goods of the '212 reg no earlier than 5/28/09, so there seems to be no doubt that the Mark was not in use by Plaintiff for the goods before 5/28/09, otherwise Plaintiff would have renewed the '609 registration or obtained a new registration with earlier first use dates.  Trial Exhibits 303, 450, 502.

3.      Also, HTIL entered into a license agreement with TMG on 8/28/08, purportedly on behalf of Plaintiff, so presumably Plaintiff would have known as of then to check its registrations and be sure to maintain them if the Mark was actually in use by then.  Trial Exhibit 305 (and 60).

4.      Instead, upon the expiration of the '609, Plaintiff filed the '393 app on 5/27/09 claiming first use in US interstate commerce of the Mark on the same clothing and same 7/73 first use date as in the '609 reg. Yet, it did not include a specimen with the application and such first use date turned out to be unsupportable.  Indeed, it failed to provide a valid specimen, then converted the application to an ITU application, failed again to provide a valid specimen and then abandoned the '393 app.  Trial Exhibits 441, 447, 502.

5.      Further, if Plaintiff was really using the Mark on all of the goods in the '399 app for the '212 reg as of 5/28/09, then it is deceptive that it filed the '393 app the day before and falsely claimed first use in commerce in 7/73 and that it did not simply wait one more day and claim 5/28/09 as its first use in commerce date as it claimed four years later in the '399 app to get the '212 reg.  Further, it was deceptive to file an in use application without a specimen of use, as Plaintiff had to know that was not proper or sustainable.  *Id.*

6.      On 8/27/09, the USPTO rejected the '399 app because no specimen was provided.  Plaintiff had six months to respond.  Trial Exhibit 446.

7.      Then, on 8/28/09, Plaintiff abandoned US Reg. No. 2, 220,842 for a bolt design for surfboards and skateboards (as in the '212) and other goods in class 28.  If

it was truly using the Mark in commerce on those goods as of 8/28/09, which is obviously after 5/28/09, then Plaintiff could have and presumably would have maintained the registration rather than abandoning it. So, this is evidence that the 5/28/09 first use in commerce date for these goods in the '212 reg was intentionally false. Trial Exhibit 460.

8.    Then, on 11/10/09, Plaintiff filed a response to the first OA in the prosecution of the '393 app and broadened the clothing goods from the clothing goods in the '609 to "Clothing, namely, knit, woven and screen print shirts, swimwear, active wear, sportswear, surfwear, tops, shirts, sweaters, sweatshirts, polo shirts, jackets, jeans, pants, skirts, vests, underwear, caps, hats, scarves, gloves, footwear, and men's and boy's hosiery," akin to the scope of the '393 app for the '212 reg. ILC again claimed first use 7/73 and in use and again filed no specimen. This turned out all to be untrue and deception. Plaintiff's apparent attempt was to try to get a reg for the bolt for clothing claiming first use in commerce as of 1973 and continuous use thereafter, which was untrue. Trial Exhibit 447.

9.    Then, on 11/12/09, Plaintiff filed the '399 app for goods including clothing, surfboards, skateboards and other goods in classes 9 (eyeglasses later dropped), 14, 18, 24 and 28 not on an in-use basis but on an intent to use basis. If Plaintiff had been using the Mark on all of the goods in the '393 application as of 5/28/09, then it is deceptive that it did not file on an in use basis and file specimens of use upon filing. Trial Exhibit 446.

10.    It also seems clear that the list of goods for the '399 app (and related '305 and '324 apps filed the same day) came from the TMG license, as the goods in the '399 app are the same as those listed in Schedule B of the agreement as Licensed Items. So, it appears that shortly after the 8/27/09 office action against the '393 app in use application for failure to provide a specimen, the 8/28/09 cancellation of the '842 reg, and the 11/10/09 response to OA in the '393 prosecution again claiming first use in 7/73 yet without a specimen, Plaintiff decided to file new intent to use apps on 11/12/09, via the '399, '305 and '324 apps, to provide registrations with the intent to cover all the goods in the TMG license. Trial Exhibits 446-449.

11.    By 1/28/10, Plaintiff had notice of Aviator Nation's alleged infringement. Thus, in addition to getting registrations to meet Schedule B of the license with TGM, it had that for motivation to try to get registrations for clothing with the earliest first use in commerce date as possible. Trial Exhibits 381, 480.

12.    On 4/13/10, ILC filed a substitute specimen (the first one, not an actual substitute) in the prosecution of the '393 app, for the newly amended broader range of clothing goods, claiming first use in commerce as of 7/73 and finally with a specimen. Mr. Lee provided the declaration of use as a purported authorized agent of Plaintiff. This was deceptive as it turned out to be untrue. The USPTO rejected the specimen as ornamental. It is unclear where the specimen came from, but it was not a valid specimen anyway. If Plaintiff had a valid specimen as of the 5/27/09 filing date of the '393 app or even as of the 11/10/09 response to OA in the prosecution of the '393 app, such as specimens showing use of the mark on hang tags, it presumably would have filed it. Rather, it did not, which undermines the veracity of its later claims of first use in commerce for the same goods in the '212 reg four years later based on specimens comprising hangtags. Rather, it shows Plaintiff was willing to make multiple conflicting representations to the USPTO in the course of trying to get new registrations, given among other things, the abandonment of the '609, the TMG license and the fact that it now concedes it was not using the Mark in interstate commerce for all of the goods in the '212 by 5/28/09 as it falsely claimed to the USPTO. Trial Exhibit 441, 447.

13.     Similarly, after the USPTO rejected the specimen Plaintiff submitted on 4/13/10, Plaintiff converted the '393 to an intent to use application, abandoning all of its prior claims of first use as of 7/73. *Id*.

14.     On 12/10/10 and 2/15/11, Plaintiff received notices of allowance for the '399, '305 and the '324 apps and the '393 app. So, now all it had to do was file valid SOU's for each application and it would get the registrations. But it did not do so. Instead, from 4/23/11 to 12/22/12, it filed four consecutive EOT's for the '399, '305 and '324 apps, indicating the Marks were not yet in use in commerce for all the goods claimed. Mr. Lee filed declarations for each of the EOT's claiming he was an authorized agent of Plaintiff. Trial Exhibits 439, 446-449.

15.     And yet, on 8/13/11, Plaintiff concurrently filed a SOU for the '393 application comprising shorts (and no label or hang tag) and claiming first use in 7/73 purportedly supported by the declaration of Mr. Lee, all of which were untrue and rejected as ornamental. Further, if ILC had labels or hang tags for specimens by 8/13/11, if it were being truthful with the USPTO, Plaintiff would have filed them then. Instead, it filed faulty specimens with false claims of first use. On 3/4/12, it abandoned the '393. This indicates Plaintiff decided it intended to rely on the '399, '305 and '324 apps to try to patch up and bolster its diminishing portfolio it was now finally trying to license, yet depleted by so many abandoned registrations and applications over the years. Trial Exhibit 447.

16.     Finally, on 6/13/13, almost four years after the 11/12/09 and more than four years since the '393 app was filed on 5/27/09 as an in use application and then abandoned after no valid specimens were provided and after Mr. Lee's false claims of first use in commerce as of 7/73 , Plaintiff filed a statement of use with declarations by Mr. Lee claiming use on all goods in '393 app (other than eyeglasses, which were dropped) in interstate commerce as of 5/28/09. Trial Exhibits 440, 446. This was false. TMG's US licensee's CFO Mr. Brussell testified that they were not selling all the goods in the '393 app using the Mark as of 5/28/09, rather Plaintiff, or its licensee, was only selling board shorts and shirts at most and if any by then. See Brussell testimony at pp. 25, 74-75, 102-114 and Trial Exhibit 500 (admissions re RFA's 85-115). Further, there is no evidence of this first use date or of use of the mark on hang tags or labels as of 5/29/09. Trial Exhibits 440, 446.

17.     Further, based on emails between Mr. Lee, or others with him from HTIL, and TMG, Mr. Lee did ask for specimens from TMG beginning in 2011 and then again in 2013, but no labels were provided until 2013, no dates were provided in the responses and the purported labels provided by TMG have date information on them from 2012, 2013 and 2014. So, Mr. Lee knew these were not from use as of 5/29/09 and there is nothing to indicate that TMG provided dates of first use or sample products. Trial Exhibits 429-430, 436.

18.     Accordingly, there is no evidence of the first use dates of 5/28/09 for all of the goods in the registration, and representations to the contrary by Plaintiff and Mr. Lee to the USPTO were false. Those representations were relied on by the USPTO to issue the '212. Plaintiff got the registrations it wanted to fit the Schedule B of Licensed Items in the TMG license and to claim the unsupported date of 5/28/09 as first use as part of the '212 reg. And, Plaintiff is now trying to assert the '212 reg and dates against Defendants, even though Defendants have evidence of use of Aviator Nation's bolt designs on clothing as early as 2006 and continuous use since then. Thus, Plaintiff's intent to deceive the USPTO to get the most favorable broad registrations with early use dates was satisfied to the damage of Defendants.

19.     As further evidence of Plaintiff's willingness to make

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

misrepresentations to the USPTO, Plaintiff or its agents recently filed section 8 and 9 declarations with the USPTO on 2/8/17 to renew U.S. Reg. No. 1,058,516, a registration which ILC refers to in ¶14 of the original Complaint in this action. It claimed use of the mark based on purported sales of unauthorized products by TMG from Europe.  However, Plaintiff also concedes that such sales were unauthorized since at least April 2015 in ¶25 of its complaint against TMG in the Southern District of California that it filed in 2018.  TMG's post agreement products cannot be both proof of use to support a registration and proof of unauthorized use to support a complaint for infringement against TMG.  This demonstrates ILC's willingness to lie to the USPTO to maintain its broken Lightning Bolt trademark portfolio, which is unsupported by actual use.  Trial Exhibits 304, 444, 451, 511.

# APPENDIX B
## SUMMARY OF FACTS AND LAW
### AGAINST ANY CLAIM OF COUNTERFEITING

1.  Plaintiff's own allegations are that Defendants' counterfeiting of a registered mark started before the '212 was registered and even before the application for the '212 was filed.   See Complaint at ¶¶ 25-28.  Similarly, Plaintiff has not alleged and cannot prove facts, nor is there any use of a counterfeit mark, sufficient to support a finding of intentional or willful conduct, and the imposition of treble, punitive and/or statutory damages.

2.  For example, Defendants' use of bolt designs on clothing cannot be found "spurious," Defendants' pre-registration use cannot be counterfeit use, and Plaintiff cannot assert counterfeit use without actual use since 2015.

3.  15 U.S.C § 1127 defines a "counterfeit" mark as: A "counterfeit" mark is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.  A "spurious" mark is "one that is false or inauthentic"; essentially, a knockoff. *United States v. Petrosian*, 126 F.3d 1232, 1234 (9th Cir. 1997). A counterfeit mark is one that is, among other things, "identical with, or substantially indistinguishable from, a [genuine] mark registered on the principal register" of the USPTO. See 15 U.S.C. § 1116(d)(1)(B)(i) (emphasis added).

4.  Registration cannot be applied retroactively to the date of application when applying 15 U.S.C. § 1117. *New Name, Inc. v. Walt Disney Co.*, 2008 U.S. Dist. LEXIS 107203, *17-18 (C.D. Cal. 2008).

5.  The registered trademark on which the counterfeit mark is modeled must be in current use at the time the counterfeiting occurs. *Id.*; see also *United States v. Foote*, 413 F.3d 1240, 1248 (10th Cir. 2005) ("The counterfeiting statute requires … that the mark be in actual use at the time of the defendant's use of that mark."); *United States v. Guerra*, 293 F.3d 1279, 1290 (11th Cir. 2002), superseded by statute on other grounds (finding that "the genuine mark must… be actually in use"). In short, a counterfeiting claim requires a defendant's use of a fake version of a registered trademark in use by the plaintiff.

**6.**  Defendants' use is not spurious.  Aviator Nation's clothes are clearly not knockoffs, and all of its clothes are marked with Aviator Nation's brands, e.g., AN logo and AVIATOR NATION.  Further, Defendants could not possibly have used a fake version of an unregistered mark before it was even claimed to be in use by Plaintiff's own Registration.  See Complaint ¶¶ 13, 26, 28, 30-32.  Nor could Plaintiff obtain pre-registration relief for alleged counterfeiting, or post-registration relief given that it is not using the mark.  At most, Plaintiff may argue that it could assert counterfeiting during the period from issuance of the '212 on August 13, 2013 to termination of the TMG license on December 31, 2014, but Defendants' use is so clearly not counterfeit that such assertion would be futile.

Appendix C
Excerpts from Trial Exhibits 310-319, 390

2006



2007



2007





2008







2009



**CERTIFICATE OF SERVICE**

I hereby certify the following: I am over the age of 18 years and am not a party to the above-captioned action. I am a registered user of the CM/ECF system for the United States District Court for the Southern District of California.

On March 18, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. To the best of my knowledge, all counsel to be served in this action is registered CM/ECF users and will be served by the CM/ECF system.

I declare under penalties of perjury under the laws of the United States that the foregoing is true and correct.

*/s Kent M. Walker*
Kent M. Walker
kwalker@lewiskohn.com
LEWIS KOHN & WALKER LLP