1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ILC TRADEMARK CORPORATION, a British Virgin Islands corporation, | Case No.  2:17-cv-07975-MWF(JPRx) |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | |
| AVIATOR NATION, INC., a California Corporation, and PAIGE MYCOSKIE, an individual, | |
| Defendants. | |
| AVIATOR NATION, INC., a California Corporation | |
| Counter-Claimant | |
| vs. | |
| ILC TRADEMARK CORPORATION, a British Virgin Islands corporation, and ROES 1-10, Inclusive, | |
| Counter-Defendant | Complaint Filed:   October 31, 2017<br>Trial Date:   April 23, 2019 |

This matter came on for trial before the Court sitting without a jury on April 23, 2019.  The following witnesses were called and examined by the parties in the order recited below:

-1-

On April 23, 2019, Scott P. Shaw appeared on behalf of Plaintiff and Counter-Defendant ILC Trademark Corporation and gave an opening statement.  Kent M. Walker appeared on behalf of Defendants Aviator Nation, Inc. ("Aviator Nation") and Paige Mycoskie and Counter-Claimant Aviator Nation and gave an opening statement.

On the same day, following opening statements, Mr. Shaw examined **Robert Mignogna**, owner of a consulting company offering management consulting in the surf industry.  Mr. Walker cross-examined Mr. Mignogna.

Next, Samuel G. Brooks, appearing on behalf of ILC Trademark Corporation, examined **Paul Epner**, the president of ILC Trademark Corporation between 1995 and 2010.  Mr. Walker cross-examined Mr. Epner and Mr. Brooks conducted a redirect examination.

Next, Mr. Brooks examined **Phillip Reed Thompson**, manager of the wholesale department of Aviator Nation.  Mr. Walker cross-examined Mr. Thompson and Mr. Brooks conducted a redirect examination.

On April 24, 2019, Mr. Shaw examined **Lee Yee Kian**, a director of ILC Trademark Corporation and CFO of the Branded Lifestyle Group.  Mr. Walker cross-examined Mr. Lee and Mr. Shaw conducted a redirect examination.

Next, Mr. Shaw examined **Sylvia Ray Elger Glassman**, an employee at the Venice Beach, California location of Aviator Nation.  Mr. Walker cross-examined Ms. Glassman and Mr. Shaw conducted a redirect examination.

Next, Mr. Brooks examined **Dave Mason**, the vice president of finance for Aviator Nation.  Mr. Walker cross-examined Mr. Mason and Mr. Brooks conducted a redirect examination.

On April 25, 2019, Mr. Shaw examined **Paige Mycoskie**, the founder and president of Aviator Nation.

On April 26, 2019, Mr. Brooks examined **James Earl Jenks, Jr.**, a clothing merchandiser in the surf industry.  Mr. Walker cross-examined Mr. Jenks; Mr. Brooks conducted a redirect examination; and Mr. Walker conduct a recross examination.

Next, Mr. Walker examined **David Drews**, the president of IP Metrics, an intellectual property consulting firm that performs valuation of patents, trademarks, and copyrights and damages assessments.  Mr. Brooks cross-examined Mr. Drews; Mr. Walker conducted a redirect examination; and Mr. Brooks conduct a recross examination.

Next, Mr. Walker examined **Lawrence Maxham**, a patent, trademark, and copyright law attorney.  Mr. Brooks cross-examined Mr. Maxham.

The Court also reviewed the designations and counter-designations of the deposition transcripts of **Michael Colucci**, a manager at the Malibu, California location of Aviator Nation, dated January 31, 2019, together with exhibits thereto; **Lylah Evenstar**, a manager at the Venice, California location of Aviator Nation dated January 31, 2019, together with exhibits thereto; **Kevin Harter**, vice president of integrated marketing at Bloomingdale's, dated January 31, 2019, together with exhibits thereto; **Lyndsey Shryer**, director of retail operations at Aviator Nation, dated February 27, 2019, together with exhibits thereto; **Lorraine Willis**, an employee at the Laguna Beach, California location of Aviator Nation, dated January 31, 2019, together with exhibits thereto; **Benjamin Brussell**, an independent contractor for TMG USA between 2008 and 2018, dated August 10, 2018, together with exhibits thereto; **Neil Boyarsky**, CEO of Bandier Holdings ("Bandier"), dated October 26, 2018, together with exhibits thereto; **William Cooper**, vice president of merchandising for women's contemporary at Saks & Company LLC ("Saks"), dated November 14, 2018, together with exhibits thereto; and **Marc P. Beige**, president of Rubie's Costume Company, Inc. ("Rubie's Costume"), dated December 10, 2018, together with exhibits thereto.

There is no need to rule explicitly on the objections in the deposition transcripts or stated in the Final Pretrial Conference Order.  To the extent an exhibit is discussed herein, any objection was overruled.  To the extent that an exhibit is not discussed, it was not viewed as particularly probative and therefore any objection may be viewed as overruled as moot.  The Court did not sustain any objection to any particular evidence, be it an exhibit or testimony, that would have changed the outcome here.

During and after testimony, exhibits were marked and received into evidence.  (*See* Amended Joint Exhibit List (Docket No. 147)).  Following the presentation of evidence and the parties' closing arguments and subsequent memoranda of law, the matter was taken under submission.

Having carefully reviewed the record and the arguments of counsel, as presented at the trial and in their written submissions, the Court now makes the following Findings of Fact and reaches the following Conclusions of Law under Rule 52 of the Federal Rules of Civil Procedure.  Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

Let me drop the third person for a moment and summarize what follows.  Defendants prevail because of the congeries of affirmative defenses relating to delay, namely acquiescence, laches, statute of limitations, waiver, estoppel, and failure to mitigate.  The elements of all these affirmative defenses run together.  To the extent that a showing as to one defense in particular is necessary, laches is established by the evidence and the law.  Plaintiff – barely – establishes the elements of its claims for relief, although I could easily have found for Defendants under the *Sleekcraft* factors.  It is also a close call whether the disputed mark here was merely ornamental, as Defendants argued, and whether Defendants are entitled to fair use.

***However***, the delay here was unjustified.  In addition, the remedies of an injunction or disgorgement would be unjust.  The value of a lightning bolt on certain clothing in a certain chain of stores is, in large part, divorced from whatever hazy and nostalgic associations still exist of 1970's surf culture in Hawai'i.

As a technical matter, do the affirmative defenses defeat Plaintiff's claims for relief as such or only prevent awarding any relief?  I haven't discovered much guidance on that, as Plaintiff's caselaw is unconvincing.  Plaintiff might not care as much as it argues – Plaintiff doesn't get any relief either way – but perhaps it matters on appeal.  I've decided

that the fair thing to the parties and the Ninth Circuit, if it comes to that, is to state clearly what I'm doing and why, and then enter judgment accordingly.

Therefore, the Court **FINDS** and **RULES** that Defendants successfully proved their affirmative defenses based on delay, which defeats any verdict or entry of judgment on Plaintiff's claims for relief. In the absence of the affirmative defenses, Plaintiff did prove the elements of its claims for relief. Were it ever determined as a matter of law that the affirmative defenses are addressed to the remedies only, then the Court additionally **FINDS** and **RULES** that the affirmative defenses deny to Plaintiff its requested remedies of an injunction or disgorgement.

## I.   <u>FINDINGS OF FACT</u>

### A.   <u>The Parties</u>

1.     Plaintiff and Counter-Defendant ILC Trademark Corporation is a British Virgin Islands corporation. (*See* Final Pretrial Conference Order (Docket No. 124)). ILC Trademark Corporation owns intellectual property which it licenses to licensees, who then make and sell products. ILC Trademark Corporation does not itself make or sell products. ILC Trademark Corporation is the registered owner of United States Trademark Registration Number 4,384,212 (the "'212 Registration"), issued April 13, 2013. (*Id.*).

2.     Defendant and Counter-Claimant Aviator Nation is a California corporation with its principal place of business in California. Defendant Paige Mycoskie is the founder and president of Aviator Nation.

### B.   <u>The Lightning Bolt Trademarks</u>

3.     The Lightning Bolt brand started as a surfboard brand in the early 1970s, and later expanded to include clothing and other goods.

4.     Lightning Bolt was associated with several of the most popular surfers in the 1970s, including Gerry Lopez, Rory Russell, and Shaun Tomson.

5.     Lightning Bolt became one of the most well-known surf brands of the 1970s.

6.     Lightning Bolt surfboards and products have been advertised and featured in *Surfer* and *Surfing* magazines beginning in the 1970s and continuing through the 2000s.

However, Lightning Bolt was not advertised in either of these magazines between 1978 and 1990, as well as intermittent years in the 1990s and 2000s.  (Ex. 84).

7.     On August 15, 1978, the United States Patent and Trademark Office ("USPTO") registered a lightning bolt symbol (the "Bolt Mark") as United States Registration Number 1099609 (the "'609 Registration") for clothing, with a priority date of July 1973, and surfboards, with a priority date of December 1972.  (Ex. 101).  The registration named the Bolt Corporation as the owner.  (*Id.*).

8.     In September 1983, Bolt Corporation filed in the USPTO a combined declaration under Sections 8 and 15 confirming that the Bolt Mark (as registered in the '609 Registration) was in use.  (Ex. 102).

9.     On February 25, 1985, the Bolt Corporation assigned the entire interest and goodwill associated with various Lightning Bolt trademarks (including, *inter alia*, the Bolt Mark) to Bolt International.  The assignment was recorded in the USPTO on September 5, 1989.  (Ex. 159).

10.    On March 15, 1990, Bolt International changed its name to International Licensing Corporation.  The name change was recorded in the USPTO on August 20, 1990.  (Ex. 159).

11.    On May 10, 1996, International Licensing Corporation assigned the entire interest and goodwill associated with its Lightning Bolt trademarks (including, *inter alia*, the Bolt Mark) to ILC Licensing Corporation, S.A.  The assignment was recorded in the USPTO on May 30, 1996.  (Ex. 159).

12.    International Licensing Corporation and ILC Licensing Corporation, S.A. are affiliated companies, created by Ernst & Young and KPMG on behalf of the publicly traded company Hang Ten Holdings Group to take advantage of royalty treaties between various countries around the world.

13.    On June 2, 2004, ILC Licensing Corporation, S.A. assigned the Bolt Mark to ILC Trademark Corporation.  The assignment was recorded in the USPTO on June 8, 2004.  (Ex. 159).

**C.**     **Lapse of the '609 Registration and ILC Trademark Corporation's Subsequent '212 Registration**

14.     As a result of inadvertence and oversight by ILC Trademark Corporation, in 2009, the '609 Registration, among others, expired and was cancelled.

15.     On November 12, 2009, ILC Trademark Corporation filed a trademark application with the USPTO, stating that it had a bona fide intention to use or use through ILC Trademark Corporation's related company or licensee the Bolt Mark for clothing and other goods.  (Ex. 130).

16.     ILC Trademark Corporation had difficulty obtaining specimens from TMG, and therefore requested extensions of time from the USPTO to file a Statement of Use showing ILC Trademark Corporation's use of the Bolt Mark in commerce to support its trademark application.

17.     After receiving four extensions of time to file a Statement of Use, on June 19, 2013, Lawrence Lee, ILC Trademark Corporation's authorized agent, filed a Statement of Use with the USPTO.  In the Statement of Use, Mr. Lee represented, with respect to ILC Trademark Corporation's use of the Bolt Mark, that the Bolt Mark "was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as May 28, 2009, and first used in commerce at least as early as May 28, 2009, and is now in use in such commerce" on all goods in the five classes listed by ILC Trademark Corporation in the application.

18.     Mr. Lee testified that he believed the first use date of May 28, 2009, may have been a mistake, as it was his understanding that the Bolt Mark had been used since the 1970s.  Mr. Lee also testified that Textil Manuel Goncalves, S.A. ("TMG"), a licensee of the Bolt Mark between 2008 and 2014, appeared to be using the Bolt Mark all on the goods in the '212 Registration by May 28, 2009, as TMG sent royalty payments during that time period for use of the Bolt Mark.

19.     On August 13, 2013, the USPTO issued the '212 Registration to ILC Trademark Corporation for the Bolt Mark for all goods on or in connection with which

ILC Trademark Corporation, in its Statement of Use, had represented that it was using the Bolt Mark in commerce.  (Ex. 130).

20.     The Bolt Mark as depicted in the '212 Registration is pictured below:



(Ex. 130).

21.     The '212 Registration indicates a first use date of May 28, 2009.  (Ex. 130).

**D.     ILC Trademark Corporation's Management License Agreement With HTIL, and HTIL's License Agreement With TMG**

22.     On April 1, 2008, ILC Trademark Corporation executed an amendment to a Trademark Management License Agreement previously entered with HTIL Corporation B.V. ("HTIL"), which amendment granted HTIL the exclusive right to manage ILC Trademark Corporation's trademarks associated with the Lightning Bolt brand in the United States of America and Canada, including the Bolt Mark.  (Ex. 74).

23.     The Bolt Mark was licensed to Luna Blue in the mid- to late-1990s.  Luna Blue put the mark on multiple products during their license period, including apparel products.  (Ex. 81).  In 2002, Luna Blue began a program selling apparel and surf products to K-Mart.  Luna Blue also made sales to Wal-Mart around the time Luna Blue's license was wrapping up in 2006.

24.     On August 28, 2008, HTIL Corporation entered an agreement with TMG granting TMG the right to manufacture and sell licensed goods using trademarks associated with the Lightning Bolt brand in the United States and Canada, including the

Bolt Mark.  (Ex. 60).  Part of the motivation in licensing to TMG during this time was to bring the Lightning Bolt brand back to its more authentic roots and sell products at the high-end market instead of big box retailers.

25.      Pursuant to the license, TMG began using the Bolt Mark and other trademarks associated with the Lightning Bolt brand on clothing and other goods at least as early as May 28, 2009.  (Ex. 75).

26.      Pursuant to the license, TMG paid royalties for use of the Bolt Mark and other trademarks associated with the Lightning Bolt brand.  (Ex. 66).

27.      The license agreement with TMG terminated on December 31, 2014.  (Ex. 60).

28.      After expiration of the license agreement, ILC Trademark Corporation discussed possibly selling the Bolt Mark and other related trademarks to TMG.  However, TMG's offer of $500,000 for the trademarks was rejected by ILC Trademark Corporation.

29.      Pursuant to the license agreement, licensed goods in inventory as of the termination of the agreement were sold for a period of three months after termination. (Ex. 60).

30.      Between 2015 and 2018, TMG manufactured Lightning Bolt-branded products pursuant to the rights it owns in Portugal, and imported the products into the United States for sale without authorization from ILC Trademark Corporation.  (Exs. 21-22).  While TMG's importation was without authorization, ILC Trademark Corporation considers the goods to be authentic "grey market" goods.

31.      On June 20, 2018, ILC Trademark Corporation filed a complaint against TMG alleging trademark infringement, unfair competition, and breach of contract based on TMG's continued importation and sale of goods after the termination of the sell-off period provided in the license agreement between HTIL and TMG.

///

///

///

-9-

E.      **Aviator Nation's Use of Lightning Bolt Symbol**

32.     In August 2006, Paige Mycoskie began selling clothing products under the brand name, "Aviator Nation."  (*See* Ex. 3).  Paige Mycoskie is currently an officer and director of Aviator Nation.

33.     Since August 2006, when Ms. Mycoskie first began selling clothing at a street festival, Aviator Nation's products have featured a lightning bolt symbol (the "AN Bolt Design").  Aviator Nation has continuously and consistently sold clothing featuring the AN Bolt Design from 2006 to the present.  Ms. Mycoskie did not run a trademark search for the lightning bolt when she first started selling clothing in August 2006.  Ms. Mycoskie viewed the lightning bolt symbol as an ornamental design that anyone could use.

34.     A representative sample of the AN Bolt Design is pictured below:



(Ex. 14; *see also* Ex. 338).

35.     Aviator Nation opened its first retail store in Venice Beach, California in 2009, and since then, has opened seven additional "Aviator Nation" brick-and-mortar

retail locations in California, Colorado, and Texas.  Aviator Nation sells its clothes retail in those locations, online, and wholesale.

36.    Aviator Nation's retail stores in California offer for sale, among other things, surf-themed clothing and hats, as well as surfboards.

37.    Ms. Mycoskie views surfing as one of the many things that inspires the Aviator Nation brand, with other inspirations including music and other outdoor sports, such as snowmobiling.

38.    Ms. Mycoskie personally creates all of the graphics and designs for Aviator Nation.  Some of Ms. Mycoskie's designs are inspired by other designs or graphics from the past, but Ms. Mycoskie always tries to put a unique spin on the graphic or design.

39.    The AN Bolt Design is one of Aviator Nation's best-selling designs.

40.    Aviator Nation's products occupy an upper retail climate, with average costs of goods ranging between $80 for a T-shirt and $800 for a snow jacket.  The garments are manufactured in Los Angeles, California and often include hand-stitching.

41.    While some published articles have characterized Aviator Nation as, among other things, "a surf lifestyle store," with "[a]ll the pieces revolv[ing] around surfing culture," Ms. Mycoskie disputes this characterization and views the "surf" aspect of the brand as only a small portion of what the brand is, with many other inspirations coming from music and other sports.  (*See* Ex. 89).  Ms. Mycoskie did not alert the journalist to what she viewed as a mischaracterization, as she does not always see all of the articles that are published about the brand.

42.    The AN Bolt Design is used on clothing featuring "Aviator Nation" labels.  Such clothing is sold retail in "Aviator Nation" stores, on the "Aviator Nation" website, and wholesale so that it is sold via a select number of third-party retail outlets.

43.    Ms. Mycoskie discovered the Lightning Bolt brand when she observed a Lightning Bolt branded surfboard while thrift shipping for vintage T-shirts in the Animal House vintage shop in Venice Beach, California.  Ms. Mycoskie was not familiar with any Lightning Bolt branded clothing.

44.     Aviator Nation is not the only retailer to sell clothing merchandise featuring a lightning bolt design.  Numerous third parties have used and continue to use lightning bolt designs on clothing in the United States that is not supplied by Aviator Nation, including Bandier, Saks, and Rubie's Costume.  (*See* Exs. 398, 402, 405).

45.     There are also multiple other U.S. trademark registrations owned by third parties of lightning bolt designs for clothing.  (Exs. 412-28).

### F.     Confusion of AN Bolt Design with Bolt Mark

46.     Customers in Aviator Nation's retail stores have asked whether Aviator Nation was associated with Lightning Bolt.

47.     Sylvie Ray Elger Glassman, an employee at the Venice Beach, California location of Aviator Nation since September 2017, testified that at the beginning of her employment with Aviator Nation, approximately five customers would come into the store per month and ask questions about any affiliation between Aviator Nation and Lightning Bolt.  Some of these customers also inquired whether Aviator Nation was affiliated with Gerry Lopez.  (Ex. 141).

48.     Ms. Glassman stated in an email to management that "[w]hen I confirm that there is no partnership or collaboration happening between us and Lightning Bolt after [customers] ask, their reply is never positive."  (Ex. 141).

49.     Likewise, Michael Colucci, a manager at the Malibu, California location of Aviator Nation, testified that he has been personally asked by customers on approximately five to ten occasions whether Aviator Nation is owned or affiliated with Lightning Bolt, usually after the customer sees merchandise with the AN Bolt Design.

50.     Various other employees of Aviator Nation retail stores recall customers inquiring about the affiliation between Aviator Nation and Lightning Bolt and/or Gerry Lopez.  (Ex. 141).

### G.     Discussions with Aviator Nation to Cease Use of the AN Bolt Design

51.     In January 2010, TMG notified HTIL of Aviator Nation's use of the AN Bolt Design via a notice letter.  (Ex. 70).  No further action was taken at that time.

52.     On various occasions in 2012, the president of TMG's United States subsidiary, Jonathan Paskowitz, emailed Paige Mycoskie stating that Aviator Nation's use of the AN Bolt Design was infringing on the Bolt Mark, to which TMG had licensing rights.  (Exs. 26, 32, 34).  Mr. Paskowitz demanded that Aviator Nation stop using the mark.

53.     Ms. Mycoskie immediately went to the USPTO website to investigate Mr. Paskowitz's claim and saw that the trademark was a dead mark.  Ms. Mycoskie did not go to the Lightning Bolt store located blocks from her own store to investigate Mr. Paskowitz's claim, although she did visit the Lightning Bolt website.

54.     Ms. Mycoskie expressed concern about the legitimacy of TMG's demands to Mr. Paskowitz and ultimately declined to cease its use of the AN Bolt Design.  (Ex. 26).

55.     In April 2013, Benjamin Brussell sent a letter to Paige Mycoskie on behalf of TMG demanding that Aviator Nation stop using the Bolt Mark.  (Ex. 24).

56.     On December 27, 2013, Manuel Gonçalves informed ILC Trademark Corporation's management via email about Aviator Nation's "use [of] the trademarks that were exclusively licensed to TMG."  (Ex. 68).  In this email, TMG stated that "[a]fter consulting with legal counsel, we have determined that the appropriate next step is to initiate legal action against Aviator Nation to compel them to respect the trademarks and recover any appropriate damages."  (*Id.*).  TMG requested consent to proceed with such legal action.  (*Id.*).  No legal action was taken at this time.

57.     In August 2016, ILC Trademark Corporation demanded that Aviator Nation stop using the AN Bolt Design on clothing.  (Ex. 25).  Aviator Nation declined.

58.     On October 30, 2017, ILC Trademark Corporation filed a complaint against Aviator Nation and Ms. Mycoskie for, *inter alia*, trademark infringement and unfair competition.

59.     ILC has not sued any person or entity for trademark infringement of the '212 Registration other than Aviator Nation and TMG.

///

-13-

60.     The true Findings of Fact are specified below because they arise from application of the applicable law.   In a jury trial, the legal citations below would have been the instructions and the Findings of Fact would have been the jury's answers to questions on a special verdict form.

61.     The Court has not forgotten the Notice of Newly Discovered Evidence (Docket No. 155) filed by Plaintiff.  The Court does not view this evidence as admissible now; more important, even if it were, it would not change anything in these Findings of Fact and Conclusions of Law.

## II.     CONCLUSIONS OF LAW

### A.     ILC Trademark Corporation's Trademark Infringement Claims

1.     A trademark is "any word, name, symbol, or device . . . [used or intended to be used] to identify and distinguish [goods] from those manufactured or sold by others and to indicate the source of the goods."  15 U.S.C. § 1127.

2.     On a plaintiff's claim for trademark infringement, the plaintiff has the burden of proving each of the following elements by a preponderance of the evidence: (1) a valid, protectable trademark; (2) the plaintiff owns the trademark; and (3) the defendant used the mark without the consent of the plaintiff in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods.  Ninth Circuit Model Jury Instructions 15.6 (2017 ed., last updated June 2019); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002) ("Overall, the plaintiff retains the ultimate burden of persuasion in a trademark infringement action, namely proof of infringement.  A necessary concomitant to proving infringement is, of course, having a valid trademark; there can be no infringement of an invalid mark.").

### 1.     Valid, Protectable Trademark

3.     One way for a plaintiff to prove trademark validity is to show that the trademark is registered.  An owner of a trademark may obtain a certificate of registration issued by the USPTO and may submit that certificate as evidence of the validity and protectability of the trademark and of the certificate holder's ownership of the trademark

covered by that certificate.  Ninth Circuit Model Jury Instructions 15.8 (2017 ed., last updated June 2019).  "Registration of a mark is prima facie evidence of the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in connection with the goods specified in the registration."  *Pom Wonderful LLC v. Hubbard, Jr.*, 775 F.3d 1118, 1124 (9th Cir. 2014).  However, "registration only provides a presumption of validity, shifting the burden to the defendant to rebut either distinctiveness or non-functionality."  *OTR Wheel Eng'g, Inc. v. West Worldwide Servs.*, 897 F.3d 1008, 1024-25 (9th Cir. 2018).

4.     The '212 Registration is prima facie evidence of the validity of the mark.

**a)    Distinctiveness**

5.     "To be valid and protectable, a mark must be 'distinctive.'"  *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010).  "Distinctiveness measures the primary significance of the mark to the purchasing public."  *Id.* (internal quotation marks and citation omitted).  The more distinctive a mark, the more protection it will be afforded.  "Marks are generally classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful."  *Id.* (citation omitted).

6.     "Suggestive, arbitrary, and fanciful marks are considered 'inherently distinctive' and are automatically entitled to federal trademark protection because 'their intrinsic nature serves to identify a particular source of a product.'"  *Zobmondo Entm't, LLC*, 602 F.3d at 1113 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

7.     On the other hand, a descriptive mark defines qualities or characteristics of a product in a straightforward way, and "will be protected only when secondary meaning is shown."  *Id.*  "In between lies suggestive marks which subtly connote something about the products."  *Id.*  Suggestive marks "convey impressions of goods that require the consumer to use imagination or any type of multistage reasoning to understand the mark's

significance."  *Pom Wonderful*, 775 F.3d at 1126.  "Generic marks are not eligible for trademark protection."  *Zobmondo Entm't, LLC*, 602 F.3d at 1113.

8.     The Court **FINDS** that the Bolt Mark is a descriptive mark.  *See Wiley v. American Greetings Corp.*, 762 F.2d 139 (1st Cir. 1985) (finding heart shape to be, at most, descriptive).  The Bolt Mark is a common, basic shape, and its use as ornamentation in clothing is not unusual.  (*See* Exs. 398, 412-28).

9.     "A merely descriptive mark can become protectable if it has acquired distinctiveness 'as used on or in connection with the applicant's goods in commerce.'" *Zobmondo Entm't, LLC*, 602 F.3d at 1113 (quoting 15 U.S.C. § 1052(f)).  "The basic element of secondary meaning is a mental recognition in buyers' and potential buyers' minds that products connected with the [mark] are associated with the same source."  *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 911 (9th Cir. 1995) (quoting *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 820 (9th Cir. 1980) (alteration in original)).

10.     The Court **FINDS** that the evidence adduced at trial establishes that the Bolt Mark has acquired secondary meaning in the surf-related apparel industry.

## 2.     Ownership

### a)     Priority of Use

11.     "It is axiomatic in trademark law that the standard test of ownership is priority of use.  To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."  *Sengoku Works, Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996); *see also Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 756 (9th Cir. 2006) ("Trademark rights are acquired by the party that first uses a mark in connection with the sale of goods.").

12.     The '212 Registration claims a first use date of May 28, 2009.  Ms. Mycoskie and Aviator Nation have used the AN Bolt Design since 2006.

13.     Here, Defendants do not claim ownership of any trademark in a lightning bolt symbol.  In fact, Ms. Mycoskie testified that she viewed the lightning bolt symbol as an ornamental design that anyone could use.

14.     Furthermore, ILC Trademark Corporation is not bound by the first use date indicated on the application, and ILC Trademark Corporation may prove earlier use by clear and convincing evidence.  *See Wells Fargo & Co. v. Stagecoach Props., Inc*., 685 F.2d 302, 304 n.1 (9th Cir. 1982).

15.     The evidence adduced at trial establishes earlier use of the Bolt Mark than 2006.

16.     Accordingly, the Court concludes that Plaintiff had sufficiently demonstrated priority of use.

**b)     Assignment of the Bolt Mark**

17.     "It is beyond dispute that a trademark owner may assign his trademark." *Russell Rd. Food & Bev., LLC v. Spencer*, 829 F.3d 1152, 1156 (9th Cir. 2016) (citing 15 U.S.C. § 1060(a)(1)).

18.     "Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public."  15 U.S.C. § 1055.

19.     The evidence adduced at trial demonstrates that HTIL was the entity that signed the license agreement with TMG even though ILC Trademark Corporation was the owner.  Mr. Epner testified that this was not an irregular practice, and that there would have been internal documents between the sister companies allowing for one company to do the licensing on behalf of the other company.

**3.     Likelihood of Confusion**

20.     In evaluating the likelihood of confusion, courts employ the eight-factor test articulated by the Ninth Circuit in *AMG Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49

(9th Cir. 1979).  These factors are: (1) the similarity of the marks; (2) the proximity of the goods covered by the marks; (3) the strength of the claimed mark; (4) similarity of marketing or advertising channels; (5) the degree of care likely to be exercised by the purchaser; (6) actual confusion over the marks; (7) the intent of defendants; and (8) likelihood of expansion of the product lines.

### a) <u>Similarity of the Marks</u>

21.     As the Ninth Circuit explained in *Pom Wonderful*, "[t]his factor is always important in determining whether a likelihood of confusion exists because when 'marks are entirely dissimilar, there is no likelihood of confusion.'"  775 F.3d at 1127 (quoting *Brookfield Commc'n v. West Coast Entm't*, 174 F.3d 1036, 1054 (9th Cir. 1999)). Accordingly, as the similarities between two marks increase, so too does the likelihood of confusion.  *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000) (holding that marks were "strikingly similar" when considered with colors as used in commerce despite PTO's determination that they were not confusingly similar based on black and white submission).

22.     In evaluating similarity the following axioms guide the Court: (1) similarity is best evaluated by appearance, sound, and meaning; (2) marks should be considered in their entirety and as they appear in the marketplace; and (3) similarities weigh more heavily than differences.  *Pom Wonderful*, 775 F.3d at 1127-28 (citing *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002)).  In considering the marks' similarities, the Court does not dissect the marks, but considers the overall impression they give to consumers.  *Playmakers, LLC v. ESPN, Inc.*, 297 F. Supp. 2d 1277, (W.D. Wash. 2003), *aff'd*, 376 F.3d 894 (9th Cir. 2004) ("[W]hat is critical is the overall appearance of the mark as used in the marketplace, not a deconstructionist view of the different components of the marks").

23.     The Court **FINDS** that the Bolt Mark and AN Bolt Design are sufficiently similar such that this *Sleekcraft* factor weighs in favor of finding likelihood of confusion. ///

### b)    Proximity of Goods Covered by the Marks

24.    This factor reflects the common-sense intuition that the danger of consumer confusion is heightened where goods are related or complimentary.  *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) (citing *Sleekcraft*, 599 F.2d at 350).  "Related goods . . . are those which would be reasonably thought by the buying public to come from the same source if sold under the same mark."  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1212 (9th Cir. 2012) (internal quotation omitted).  To satisfy this factor, parties do not need to be direct competitors, so long as the goods are similar in use and function.  *See Entrepreneur Media*, 279 F.3d at 1147 (explaining that goods are related when both companies offer products relating to the same general industry).

25.    The Court **FINDS** that this *Sleekcraft* factor weighs in favor of finding likelihood of confusion.  The Bolt Mark and AN Bolt Design are used on clothing products in the surf-related apparel industry.

### c)    Strength of the Claimed Mark

26.    For the reasons cited in Section II.A.1.a *infra*, the Bolt Mark is a descriptive mark.

27.    However, "[i]dentifying whether a mark is arbitrary, fanciful, suggestive, descriptive, or generic is only the first step.  The second step is to determine the strength of the mark in the marketplace, *i.e.*, the commercial strength of the mark."  *Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1010 (N.D. Cal. 2015) (citation omitted).

28.    The Court was presented with evidence that the marketplace is crowded with similar marks, but that the Bolt Mark has acquired secondary meaning within the surf-related apparel industry.  Accordingly, the Court **FINDS** that this *Sleekcraft* factor is neutral.

### d)    Similarity of Marketing or Advertising Channels

29.    "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products."

*Pom Wonderful*, 775 F.3d at 1130.  "Marketing channels can converge even when different submarkets are involved so long as the general class of purchasers exposed to the products overlap."  *Id.* (internal quotation omitted).

30.    The evidence at trial establishes that the parties' customer bases overlap at least somewhat and that both the AN Bolt Design and Bolt Mark have been marketed online in similar manners.  Accordingly, the Court **FINDS** that this *Sleekcraft* factor weighs in favor of finding a likelihood of confusion.

<strong>e)</strong>    <u><strong>Degree of Care Likely to Be Exercised by the Purchaser</strong></u>

31.    The Court views the parties' products from the standpoint of "typical buyer exercising ordinary caution."  *Sleekcraft*, 599 F.2d at 353 (citing *HMH Publishing Co. v. Lambert*, 482 F.2d 595, 599 n.6 (9th Cir. 1973)).  It is generally assumed that sophisticated consumers and buyers of expensive goods will exercise greater care in their purchases, thereby reducing the likelihood of confusion or mistake as to the origin of the goods.  *See Pom Wonderful*, 775 F.3d at 1127 ("Unlike purchasers of expensive goods— whom we expect to be more discerning and less easily confused—purchasers of inexpensive goods are likely to exercise less care, thus making confusion more likely.") (internal quotation marks omitted).

32.    The evidence adduced at trial establishes that the products sold by Aviator Nation are relatively expensive such that purchasers would exercise a higher degree of care.  Accordingly, the Court **FINDS** that this *Sleekcraft* factor weighs against finding likelihood of confusion.

<strong>f)</strong>    <u><strong>Actual Confusion Over the Marks</strong></u>

33.    "Evidence of actual consumer confusion 'is not necessary for a finding of likelihood of confusion, but it bears on the inquiry and is particularly potent."  *Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825, 839 (C.D. Cal. 2018) (quoting *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 433 (9th Cir. 2017)).

34.    The evidence adduced at trial establishes that there is at least some confusion in the marketplace between the Bolt Mark and the AN Bolt Design.  Accordingly, the

Court **FINDS** that this *Sleekcraft* factor weighs in favor of finding likelihood of confusion.

### g)   <u>Intent of Defendants</u>

35.   When an alleged infringer knowingly adopts a mark similar to another's, courts will generally presume an intent to deceive the public.  *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993); *see also Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 158 (9th Cir. 1962) (explaining that defendant's adoption of the "Black & White" mark used by a well-known whiskey company indicates that the brewing company expected confusion and resulting profit).  Generally, however, the intent factor will be of minimal importance because intent can be hard to prove and "evidence of the defendant's intent to confuse customers . . . is not required for a finding of a likelihood of confusion."  *Pom Wonderful*, 775 F.3d at 1131.

36.   The evidence at trial does not establish that Ms. Mycoskie or Aviator Nation knowingly adopted a mark similar to the Bolt Mark.  The Court finds credible Ms. Mycoskie's testimony that she was not aware of any Lightning Bolt clothing products when she first started the Aviator Nation brand in 2006, and that she genuinely believed that the "Lightning Bolt" brand was dead.  Accordingly, the Court **FINDS** that this *Sleekcraft* factor weighs against finding a likelihood of confusion.

### h)   <u>Likelihood of Expansion of the Product Lines</u>

37.   The final *Sleekcraft* factor directs the court to consider the likelihood that one of the parties' product lines will expand to compete with the other.  Again, evidence of product expansion is not required for a finding of likelihood of confusion.  *Pom Wonderful*, 775 F.3d at 1131 (citing *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 509 (9th Cir. 2011) (characterizing the product expansion factor as "neutral" because neither party presented evidence regarding the likelihood of expansion)).

38.   Here, neither party has presented persuasive evidence regarding the likelihood of product expansion, although Plaintiff and Defendants agree that Aviator Nation has experienced increased sales each year Aviator Nation has been in operation.

Accordingly, the Court **FINDS** that this *Sleekcraft* factor is neutral in finding a likelihood of confusion.

### B. Affirmative Defenses to ILC Trademark Corporation's Trademark Infringement Claims

#### 1. Continuous Prior Use

39.    Prior use is a "complete defense" to claims of trademark infringement under the Lanham Act. *Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 843 (9th Cir. 1969), *disapproved on other grounds, Golden Door, Inc. v. Odisho*, 646 F.2d 347 (9th Cir. 1980). A litigant claiming a defense under § 1115(b)(5) must show that (1) it adopted the mark without actual or constructive knowledge of the registrant's prior use; (2) it used the mark before the registrant filed its trademark application; and (3) it continuously used the mark after the registrant filed its application. *Quiksilver, Inc.*, 466 F.3d at 761 (citing 15 U.S.C. § 1115(b)(5)). "While the first use need not be extensive, the use must be bona fide and commercial in character." *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1126 (9th Cir. 2006). A "litigant attempting to establish priority of commercial use must demonstrate both adoption of the marks and use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Id.* (internal quotation marks and alteration marks omitted).

40.    The Court determines that Defendants fail to establish continuous prior use because the Bolt Mark had already been registered on the principal register prior to when Aviator Nation began using the AN Bolt Design in 2006, during which time the Bolt Mark was live. The registration therefore provided constructive notice of Plaintiff's claim of ownership. 15 U.S.C. § 1072. The cancellation of the '212 Registration in 2009 did not result in the loss of Plaintiff's trademark rights.

#### 2. Laches

41.    Laches is an equitable time limit on a party's right to bring suit and bars a claim upon a showing of (1) unreasonable delay by plaintiff in bringing suit, and (2)

prejudice.  *Miller v. Glenn Miller Prods., Inc*., 454 F.3d 975, 997 (9th Cir. 2006).  "This defense embodies the principle that a plaintiff cannot sit on the knowledge that another company is using its trademark, and then later come forward and seek to enforce its rights."  *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 989 (9th Cir. 2009).

42.    "We analyze the laches defense with a two-step process."  *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 878 (9th Cir. 2014).  "First, we assess the plaintiff's delay by looking to whether the most analogous state statute of limitations has expired. . . . If the most analogous state statute of limitations expired before suit was filed, there is a strong presumption in favor of laches."  *Pinkette Clothing, Inc. v. Cosmetic Warriors, Ltd.*, 894 F.3d 1015, 1025 (9th Cir. 2018) (citations omitted). The most analogous state statute of limitations in this case is California's four-year statute of limitations for trademark infringement actions.  *Id.*  "The limitations period for laches starts when the plaintiff 'knew or should have known about its potential cause of action.'" *Internet Specialties*, 559 F.3d at 990.  "Second, we assess the equity of applying laches using the *E-Systems* factors: (1) 'strength and value of trademark rights asserted;' (2) 'plaintiff's diligence in enforcing mark;' (3) 'harm to senior user if relief denied;' (4) 'good faith ignorance by junior user;' (5) 'competition between senior and junior users;' and (6) 'extent of harm suffered by junior user because of senior user's delay.'"  *Id.*  "[I]n each case, the district court must weigh the plaintiff's delay and the resulting prejudice to the defendant to determine whether and to what extent laches bars the requested relief, including a request for an injunction."  *Id.* at 1027.

43.    Where trademark infringement is willful, laches will not bar equitable relief. *DC Comics v. Towle*, 802 F.3d 1012, 1026 (9th Cir. 2015) (laches doctrine "does not apply, however, 'in cases of willful infringement'") (quoting *Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221, 1228 (9th Cir. 2012)).

44.    Infringement of a trademark is willful when it is calculated to exploit the advantage of an established mark, or otherwise committed with the intent to capitalize on

the goodwill associated with the trademark.  *Id.*; *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993).

45.   "'[L]aches typically does not bar prospective injunctive relief.  However, the rule is not . . . an absolute one.' . . . [I]n each case, the district court must weigh the plaintiff's delay and the resulting prejudice to the defendant to determine whether and to what extent laches bars the requested relief, including a request for an injunction." *Pinkette Clothing, Inc.*, 894 F.3d at 1027 (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959 (9th Cir. 2001)).

46.   Here, the Court determines that the balance of equities bars Plaintiff's claim for prospective injunctive relief.  Specifically, the first, second, fourth, and sixth of the *E-Systems* factors weigh in favor of finding laches.

47.   As to the first factor, the strength of the mark is only moderately strong, with most of its strength coming from acquired secondary meaning.  *See Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1102 (9th Cir. 2004) ("Descriptive or suggestive marks are relatively weak.").

48.   As to the second factor, Plaintiff should have known about its claims as early as January 2010, when TMG notified HTIL of Aviator Nation's use of the AN Bolt Design via a notice letter.  Plaintiff did not initiate this lawsuit until October 31, 2017, over seven years after Plaintiff was put on notice of Aviator Nation's use of the AN Bolt Design.  Plaintiff's excuse for the delay, namely that its practice is to attempt to negotiate with the alleged infringer before beginning legal action, is not a persuasive justification for the length of the delay.  *See Pinkette Clothing, Inc.*, 894 F.3d at 1027 (affirming decision that after jury found infringement, a five-year delay triggered laches that barred a permanent injunction)

49.   As to the fourth factor, the evidence adduced at trial establishes the good faith ignorance of Defendants in use of the AN Bolt Design.

50.   As to the sixth factor, the evidence adduced at trial establishes that Defendants have built a valuable business around the AN Bolt Design such that Plaintiff's

delay in bringing suit has caused harm to Defendants.  *See Grupo Gigante*, 391 F.3d at 1105 ("[A] defendant can make the required showing of prejudice by proving that it has continued to build a valuable business around its trademark during the time that the plaintiff delayed the exercise of its legal rights.").

51.    The Court also **FINDS** that Defendants' infringement of the Bolt Mark was not willful such that laches is inappropriate here.  Plaintiff argues that Defendants are "merely using [the Lighting Bolt] ornamentally to trade on the goodwill associated with the Mark." (Proposed Legal Authorities for Court Trial (Docket No. 144) at 6).  The Court further **FINDS** that Defendants are using the Lighting Bolt for their own reasons independent of any putative goodwill that might linger in regard to this Mark.

52.    The same reasoning prevents any disgorgement of profits based on selling clothing with the Bolt Mark.  The evidence conclusively shows, and the Court **FINDS**, that any profits arose from matters unrelated to the Bolt Mark as a trademark now owned by Plaintiff.  Rather, the profits arose from such matters as the quality and style of the goods, the growing reputation of the brand, and the "vibe" of the brick-and-mortar stores.  Based on the evidence, there is no reason to think that the goods would not have sold as well if some other mark had been chosen.

## C.    <u>Aviator Nation's Counterclaims</u>

### 1.    <u>Fraudulent Procurement</u>

53.    "A party may seek cancellation of a registered trademark on the basis of fraud under 15 U.S.C. § 1064(c) by proving a false representation regarding a material fact, the registrant's knowledge or belief that the representation is false, the intent to induce reliance upon the misrepresentation and reasonable reliance thereon, and damages proximately resulting from the reliance."  *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990); *see Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013) (same) (citing *id.*); *Quicksilver*, 466 F.3d at 755 ("Fraud in procuring a mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application.") (internal quotation marks omitted).  "[T]he burden of

proving that a party fraudulently procured a trademark registration is heavy[.]" *Robi*, 918 F.2d at 1444.  "Fraud in a trademark cancellation is something that must be 'proved to the hilt' with little or no room for speculation or surmise . . . and any doubts resolved against [the] charging party." *Yocum v. Covington*, 216 U.S.P.Q. 210, 216 (TTAB 1982).

54. The Court determines that Defendants have not carried their burden of establishing that the Bolt Mark was fraudulently procured.  Defendants have not shown that ILC Trademark Corporation made a false representation to the USPTO, *i.e.*, that the representations made by Lawrence Lee concerning the extent of use of the Bolt Mark in the Statement of Use was false.  The Court **FINDS** credible Mr. Lee's testimony that TMG appeared to be using the Bolt Mark all on the goods in the '212 Registration by May 28, 2009, but that TMG did not send specimens of use to ILC Trademark Corporation at that time.

### 2. Declaration of Invalidity for Mere Ornamentality and Fair Use

55. To establish their claim for fair use, Defendants must prove the following by a preponderance of the evidence: (1) Defendants used the mark other than as a trademark; (2) Defendants used the mark fairly and in good faith; and (3) Defendants used the mark only to describe the Defendants' goods or services as those of Defendants' and not at all to describe Plaintiff's product.  Ninth Circuit Model Jury Instructions 15.24 (2017 ed., last updated June 2019).

56. The Court concludes that Aviator Nation's use of the AN Bolt Design does not constitute fair use or mere ornamental use.  First, for the reasons stated above, ILC Trademark Corporation has a descriptive mark accompanied by secondary meaning in the surf-related apparel industry.  Second, the Court determines that Defendants do not use the AN Bolt Design only to describe Defendants' goods or services.

### 3. Abandonment

57. "A trademark owner loses its exclusive rights if it fails to actually use the mark." *Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158, 1167-68 (9th Cir. 2013) (citation omitted).  "To show abandonment by nonuse, the party claiming abandonment must prove

both the trademark owner's (1) 'discontinuance of trademark use' and (2) 'intent not to resume such use.'"  *Grocery Outlet, Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007) (citation omitted).

58.     Evidence of non-use of the mark for three consecutive years is prima facie evidence of abandonment.  15 U.S.C. § 1127; *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 411-12 (9th Cir. 1996).  "Once created, a prima facie case of abandonment may be rebutted by showing valid reasons for nonuse or lack of intent to abandon the mark."  *Abdul-Jabbar*, 85 F.3d at 411 (citation omitted).

59.     There is a split of authority on the issue of whether abandonment must be proven by a preponderance of the evidence or clear and convincing evidence.  *See* Ninth Circuit Model Jury Instructions 15.22 (2017 ed., last updated June 2019) ("No Ninth Circuit case establishes the standard of proof required to prove abandonment as between 'clear and convincing' and 'preponderance.'").  But "[s]cholars note that except for the Federal Circuit, 'all' courts follow a clear and convincing standard of proof of abandonment."  *Id.*; 3 McCarthy on Trademarks and Unfair Competition § 17:12 (5th ed.) ("The majority of courts have interpreted the 'strictly proved' rule to mean that evidence of the elements of abandonment must be clear and convincing.").

60.     Aviator Nation and ILC Trademark Corporation have presented a prima facie case for abandonment, as ILC Trademark Corporation have not had a U.S. licensee for the Bolt Mark since 2014, when the license agreement with TMG expired.

61.     However, ILC Trademark Corporation has demonstrated valid reasons for nonuse or lack of intent to abandon the mark, since ILC Trademark Corporation was in negotiations with TMG to sell the Bolt Mark and was otherwise in discussions with other companies about licensing the rights to the Bolt Mark.

62.     To the extent Defendants contend that ILC Trademark Corporation's predecessors in interest abandoned the mark such that the predecessors-in-interest did not have trademark rights to assign, ILC Trademark Corporation establishes a lack of intent to abandon the Bolt Mark.  First, in September 1983, Bolt Corporation filed in the USPTO a

combined declaration under Sections 8 and 15 confirming the Bolt Mark (as registered in the '609 Registration) was in use.  (Ex. 102).  Furthermore, the Court finds credible testimony from Mr. Epner that ILC Trademark Corporation never intended to abandon the Bolt Mark.

### **VERDICT**

The Court **FINDS** and **CONCLUDES** as follows:

1. On Plaintiff's First Claim for trademark infringement, in violation of 15 U.S.C. §§ 1114 and 1125, the Court finds in favor of Plaintiff to the extent that it has proven – barely – the elements of this claim.

2. On Plaintiff's Second Claim for trademark infringement in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, the Court finds in favor of Plaintiff to the extent that it has proven – barely – the elements of this claim.

3. On Defendant's First Counterclaim for fraud on the USPTO, the Court finds in favor of Plaintiff to the to the extent that it has proven – barely – the elements of this claim.

4. On Defendant's Second, Third, Fourth, Fifth, Sixth, and Ninth Affirmative Defenses for acquiescence, laches, statute of limitations, waiver, estoppel, and failure to mitigate, the Court finds in favor of Defendants.  This finding both acts as a bar to entry of judgment on Plaintiff's claims for relief and as a bar to the requested remedies, *i.e.*, an injunction or disgorgement.

5. On Defendant's Eleventh and Twelfth Affirmative Defense for continuous prior use, the Court finds in favor of Plaintiff.

6. On Defendant's Second Counterclaim for declaration of invalidity for mere ornamentality, the Court finds in favor of Plaintiff.

7. On Defendant's Third Counterclaim for declaration of invalidity for abandonment, the Court finds in favor of Plaintiff.

///

8. On Defendant's Fourth Counterclaim for declaration of invalidity for lack of control or not distinctive as a source, the Court finds in favor of Plaintiff.

9. No party should be viewed as having prevailed.

The Court will enter a separate judgment pursuant to Federal Rules of Civil Procedure 54 and 58(b).

Dated:  November 24, 2020

_____

MICHAEL W. FITZGERALD
United States District Judge